Alan S. QUAIF, Plaintiff–Appellant,

v.

Jeffrey JOHNSON, Commissioner of Banking & Insurance of the State of Vermont, as Receiver for Ambassador Insurance Co., Defendant–Appellee.

No. 92–9273.

United States Court of Appeals, Eleventh Circuit.

Oct. 19, 1993.

Jay E. Loeb, Gershon Olim Katz Loeb & Lester, Atlanta, GA, for plaintiff-appellant.

William B. Brown, George H. Myshrall, Jr., Heyman & Sizemore, Atlanta, GA, for defendant-appellee.

Before KRAVITCH and BLACK, Circuit Judges, and DYER, Senior Circuit Judge.

PER CURIAM:

AFFIRMED on the basis of the Order of the District Court dated November 17, 1992, incorporated into and made part of this Opinion and attached hereto as Appendix.

## APPENDIX

United States District Court
Northern District of Georgia
Atlanta Division

Alan S. Quaif, Appellant,

v.

Jeffrey Johnson, Commissioner of Banking and Insurance of the State of Vermont, as Receiver for AMBASSADOR INSURANCE CO., Appellee.

Civil No. 1:92–cv–1254–ODE.

Nov. 18, 1992.

### ORDER

ORINDA D. EVANS, District Judge.

This bankruptcy case is before the court on Appellant Quaif's appeal from an order of

the bankruptcy court granting summary judgment on a complaint of non-dischargeability. For the reasons outlined below, the bankruptcy court's order is AFFIRMED.

The debtor in this Chapter 7 case is Alan S. Quaif ("Quaif"). Quaif was the sole shareholder and principal officer of Overseas & Domestic Underwriters, Ltd. ("Overseas"). Overseas entered into a contract with Ambassador Insurance Co. ("Ambassador") by which Overseas would act as agent for Ambassador in the sale of insurance to other commercial insurance agents.[1] This agency agreement commenced on or about September 24, 1974.

The agency agreement contains the following provision:

> Premiums received by CORRESPONDENT [Overseas] shall be deemed AMBASSADOR'S funds and shall be held in trust by CORRESPONDENT for and on behalf of AMBASSADOR. All premiums shall be remitted to AMBASSADOR within 45 days form the end of the month in which the policy or endorsement is effective.

Another provision of the agreement stated that Quaif warranted that he had "a valid insurance broker's and/or agent's license issued by the State of Georgia and would place insurance business with Ambassador in compliance with all applicable laws and regulations of said state."

Overseas collected premiums on behalf of Ambassador and other insurance companies. These premiums were deposited into a common premium account, and records were kept showing the origin of the deposits and the insurance company on whose behalf such premiums were collected. The premium funds were kept separate from Overseas' operating and payroll accounts; however, Overseas did not maintain a segregated account for each insurance company, but instead kept all premiums in a single bank account.

Ambassador was adjudged insolvent in 1983. Thereafter, Jeffrey Johnson, as Commissioner of Banking and Insurance of the State of Vermont ("Johnson"), became the Receiver for Ambassador. Johnson soon discovered that Overseas had failed to remit a large amount of premium funds collected on behalf of Ambassador. It was later learned that much of this money had been transferred to the operating and payroll accounts of Overseas to meet its operating expenses.

On February 26, 1985, Johnson filed a complaint in the Superior Court of Fulton County, Georgia, and obtained a money judgment against Quaif for $454,209.45 on July 12, 1989. The basis for this judgment was that Quaif and Overseas had failed to pay the required premiums to Ambassador, and had instead transferred some of them to Overseas' operating and payroll accounts. In 1987, Overseas also sought bankruptcy protection.

Johnson then filed a complaint in the bankruptcy court requesting a declaration that this judgment against Quaif was not dischargeable in bankruptcy. The bankruptcy court entered summary judgment in favor of Johnson, holding that the debt was non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) because Quaif committed a defalcation while acting in a fiduciary capacity. Quaif now appeals the grant of summary judgment by the bankruptcy court.

Although the Bankruptcy Code generally favors the discharge of debts, some debts are deemed to be non-dischargeable. One of these categories is described in 11 U.S.C. § 523(a)(4), which provides that there should not be a discharge of a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The bankruptcy court found that Quaif was acting in a fiduciary capacity when he acquired the premiums, and that he had committed a "defalcation" by failing to remit those premiums to Ambassador.

Quaif makes several arguments on appeal from the bankruptcy court's order. First, he argues that there was no fiduciary relation-

---

1. There is some ambiguity regarding the exact parties to the contract. Quaif alleges that the contract was solely between Ambassador and Overseas. Johnson argues that Quaif was a party in his individual capacity as well as in a representative capacity for Overseas. The bankruptcy court noted this ambiguity, but found it unnecessary to decide the question because of its resolution that the fiduciary relationship was created by statute, not contract.

ship for purposes of § 523(a)(4) because there was no express trust and no trust created by statute. Second, he argues that there was no contractually-created fiduciary relationship. Finally, he argues that the bankruptcy court improperly looked to Georgia law rather than Vermont law when analyzing the impact of state law on the determination of fiduciary capacity.

Johnson argues that a fiduciary relationship existed between Ambassador and Quaif for three reasons: (1) the general principal-agent status created a fiduciary relationship; (2) the contract provided that the premiums were to be held "in trust"; and (3) the Georgia insurance code created a technical trust for the benefit of Ambassador. He also argues that no wrongful intent is necessary for defalcation, so the other prong of § 523(a)(4) is clearly satisfied.

The bankruptcy court based its holding on O.C.G.A. § 33–23–79, which provides:

All funds representing premiums received or return premiums due the insured by any agent, broker, or solicitor shall be accounted for in his fiduciary capacity, shall not be commingled with his personal funds, and shall be promptly accounted for and paid to the insurer, insured, or agent as entitled to such funds. Nothing contained in this Code section shall be deemed to require any agent, broker, or solicitor to maintain a separate bank deposit for the funds of each principal, if the funds so held for each principal are reasonably ascertainable from the books of accounts and records of the agent, broker, or solicitor.

This statute applies to Quaif rather than to Overseas, because of O.C.G.A. § 33–23–1 which provides that only an individual, not a corporation, may be licensed as an agent. The bankruptcy court concluded that these statutes created a fiduciary duty within the meaning of § 523(a)(4), and that therefore the claim was non-dischargeable.

The language of § 523(a)(4) is similar, but not identical, to provisions of the various bankruptcy statutes in effect since 1841. Al-though the wording has changed slightly, all of the versions have referred to "defalcation" and to "fiduciary capacity" or "fiduciary character." The Supreme Court has consistently held that the term "fiduciary" is not to be construed expansively, but instead is intended to refer to "technical" trusts. *See Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844); *Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891); *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Unfortunately, the Supreme Court has not spoken on this issue since the *Davis* case, leaving the lower courts to struggle with the concept of "technical" trusts.

In nineteenth century jurisprudence, the concept of "trust" generally fell into two categories: (1) a voluntary trust, created by contract, often referred to as an "express" trust, and (2) a trust created by operation of law, such as a constructive trust or resulting trust, which generally served as a remedy for some dereliction of duty in a confidential relationship, regardless of the intentions of the parties. *In re Turner,* 134 B.R. 646, 650 (Bankr.N.D.Okl.1991).[2] In the early judicial interpretation of the predecessors to § 523(a)(4), the courts seemed to include the voluntary, "express" trust within the scope of "fiduciary capacity," while excluding the involuntary resulting or constructive trust from the scope of the exception. *See Chapman.* *Davis* and other cases also articulated a requirement that the trust relationship have existed prior to the act which created the debt in order to fall within the statutory exception. *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980). A resulting trust would therefore not fall within the exception because the act which created the debt simultaneously created the trust relationship.

The difficulty arose with the advent of statutorily-created "trusts." Statutes, such as O.C.G.A. § 33–23–79, create fiduciary duties that are dependent upon the relationship between the parties, but fit into neither of the traditional categories. They are not agreed upon by the parties, nor are they

---

**2.** This case contains an extremely thorough and insightful description of the history of § 523(a)(4). It traces both the statutory changes and the trends in judicial interpretation over the past 150 years.

created *ex post* as a remedial measure to right a wrong. The lower courts have struggled with reconciling this new type of fiduciary duty with the traditional categories, but have failed to produce uniform results. *See Turner*, 134 B.R. at 653–56, and cases cited therein.

The Eleventh Circuit, during its eleven-year existence, has never explicitly addressed the problem before this court.[3] The most recent binding precedent is *Matter of Cross*, 666 F.2d 873 (5th Cir. Unit B, 1982), decided under the old Bankruptcy Act.[4] In *Cross*, the officer/debtor committed a defalcation by failing to pay subcontractors and suppliers on a construction job to be completed by the officer's corporation. The court concluded that the exception to discharge required that there be a pre-existing fiduciary duty owing to the creditor, not just the corporation which the officer worked for. The debt was found to be dischargeable because there was no pre-existing contractual or statutory fiduciary duties owed by the individual officer to the creditor.

Quaif relies heavily on *Cross* to support his argument that he was not acting in a "fiduciary capacity" for purposes of § 523(a)(4). However, *Cross* is not determinative of this case, because there are several important factual distinctions. The most crucial of these distinctions involves the relationship between the debtor and the creditor. In *Cross*, the debtor was simply the principal officer of the corporation which owed the debt to the creditor. In the case before this court, the debtor (Quaif) was certainly more intertwined with Ambassador, as a result of the intersection of contract and statute. Although Quaif argues that he was not a party to the contract with Ambassador, the contract warrants that "he" is a licensed insurance agent; Georgia law provides that only an individual may hold an insurance license. O.C.G.A. § 33–23–1.

Furthermore, in *Cross* there was no statute creating any fiduciary duties. In contrast, O.C.G.A. § 33–23–79 created fiduciary duties that are arguably sufficient to create a "technical" trust. Under that statute, an agent is required to promptly account for and remit payments of funds to the insurer, and is forbidden from commingling the funds with his operating or personal accounts. *Cf. Matter of Angelle*, 610 F.2d 1335 (5th Cir. 1980) (statute that creates trust upon misappropriation does not satisfy "fiduciary" requirement, but statutes which impose trust-like duties, such as segregating accounts, may make parties into fiduciaries).

■ Quaif emphasizes that Georgia law, as well as the practice between Overseas and Ambassador, never required a separate bank account to be set up solely for Ambassador's premiums. Therefore, according to Quaif, there was no trust created because the res was never separately identified. It is true that some cases have indicated that a separation of the funds is necessary to establish the existence of a technical trust. *See Matter of McCraney*, 63 B.R. 64, 67 (Bankr.N.D.Ala. 1986); *In re Kelley*, 84 B.R. 225, 230 (Bankr. M.D.Fla.1988). However, the court does not believe that a separation of premium funds *into distinct bank accounts* is an essential requirement of a trust. The Georgia statute requires that the premiums must be separate from other types of funds, but may be kept in a common premium account as long as there were adequate records of the sources of these funds. The court finds that this is sufficient "segregation" to satisfy the requirement that the fiduciary duties be created prior to the act of defalcation. *See In re Nicholson*, 55 B.R. 645 (Bankr.N.D.Ga.1985); *In re McCormick*, 70 B.R. 49 (Bankr.W.D.Pa. 1987) (utilizing insurance statute virtually identical to Georgia statute).

■ Having concluded that the Georgia statute created fiduciary duties on the part of Quaif, the court now turns to the

---

3. The sole exception is the Eleventh Circuit's summary affirmance in *Kraemer v. Crook*, 94 B.R. 207 (N.D.Ga.1988), *aff'd* 873 F.2d 1406 (11th Cir.1989), which presented a different factual scenario (dischargeability of workers' compensation judgment).

4. Section 17(a)(4) of the former Bankruptcy Act provided:
   A discharge in bankruptcy shall release a bankrupt from all his provable debts, [except those] created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity....

question of whether there was a "defalcation." "Defalcation" refers to a failure to produce funds entrusted to a fiduciary. *In re Alvey*, 56 B.R. 170 (Bankr.W.D.Ky.1985). However, the precise meaning of "defalcation" for purposes of § 523(a)(4) has never been entirely clear. *Turner*, 134 B.R. at 657. An early, and perhaps the best, analysis of this question is that of Judge Learned Hand in *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2nd Cir.1937). Judge Hand concluded that while a purely innocent mistake by the fiduciary may be dischargeable, a "defalcation" for purposes of this statute does not have to rise to the level of "fraud," "embezzlement," or even "misappropriation." *Id.* at 512. Some cases have read the term even more broadly, stating that even a purely innocent party can be deemed to have committed a defalcation for purposes of § 523(a)(4). *See McCormick*, 70 B.R. at 51; *American Ins. Co. v. Lucas*, 41 B.R. 923 (W.D.Pa.1984).

The record before the court indicates that the transfer of funds from the premium account to the operating and payroll accounts was far more than an innocent mistake or even negligence. Quaif does not seriously contest that the transfer was intentional. Therefore, the court must conclude that the failure to remit premiums to Ambassador constituted a defalcation within the meaning of § 523(a)(4). *See also, In re Gagliano*, 44 B.R. 259 (Bankr.N.D.Ill.1984).

The final argument presented by Quaif is that the bankruptcy court improperly applied Georgia law rather than Vermont law. Quaif's argument must be rejected. Although the contract provided that the governing substantive law would be that of Vermont, Quaif is still governed by Georgia law in his role as an insurance agent. He was licensed by the state of Georgia, and as a licensed agent he was governed by the laws regulating such agents (such as O.C.G.A. § 33–23–79) regardless of the law to be applied to a contract with a third party. Those regulations are not waivable by contract.

In summary, Quaif was under a statutory duty to keep premium funds separate from operating funds, to keep records regarding the premium funds, and to account for those funds to the principal. Therefore, Quaif was acting "in a fiduciary capacity" when he committed a defalcation. The judgment obtained by Johnson against Quaif falls within the exception of § 523(a)(4) and is non-dischargeable.

Accordingly, the order of the bankruptcy court is AFFIRMED.

SO ORDERED, this 17 day of November, 1992.