In re James Edward CADY, Jr., Debtor.

**RENTRAK CORPORATION, Plaintiff,**

v.

**James Edward CADY, Jr., Defendant.**

**Bankruptcy No. 93–50258.**
**Adv. No. 93–5024.**

United States Bankruptcy Court,
S.D. Georgia,
Waycross Division.

April 8, 1996.

Grady W. Henry, Jesup, GA, for debtor/defendant.

Dennis Strickland, Waycross, GA, for plaintiff.

Stephen L. Jackson, Chapter 7 Trustee, Waycross, GA.

### MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This case comes before the Court on Complaint To Determine Dischargeability Of Debt filed by the Rentrak Corporation ("Rentrak"). The Court conducted a trial in this adversary proceeding on February 22–23, 1996. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I). For the following reasons, the Court finds in favor of the defendant and against the plaintiff. The following findings of fact and conclusions of law are published in accordance with Fed. R.Bankr.P. 7052.

### FINDINGS OF FACT

Prior to the events which are the subject of this suit, Rentrak entered into an agreement with Video Odyssey, Incorporated ("Video Odyssey") for the lease and sale of video tapes provided by Rentrak. Video Odyssey was owned by Willie Eugene Sapp and Ronnie Lee Tucker. At this time James Edward Cady, Jr., ("Debtor") was an employee of Video Odyssey.

The agreement between Video Odyssey and Rentrak (the "Agreement") was that Rentrak would provide video tapes which Video Odyssey would in turn lease to the general public, and eventually sell under terms particular to each tape. Video Odyssey would remit a portion of the funds generated by the lease or sale of the tapes to Rentrak.

The sale of the tapes was contemplated by the Agreement, subject to a "hold back" period during which the tapes were not supposed to be sold. During this period, typically 45–90 days, the Agreement only allowed tapes to be leased. If a tape was sold during the hold back period, the Agreement contained a liquidated damages clause which obligated the store owner to pay the full retail price of the tape. If a tape was sold after the hold back period, the amount charged depended upon how long the film had been released as well as whether the title was a "big name." In most cases, this amount was approximately 20–25% of the retail price. The store was never obligated to seek Rentrak's permission prior to selling a tape. Video Odyssey was free to return tapes to Rentrak's warehouse if the tape was not performing well. At all times legal title to the tapes remained with Rentrak.

Once the store owner selected the desired tapes from Rentrak's previews and promotions, Rentrak would ship the tapes to the store. The leasing and sale of the tapes was recorded via a computer system called "PPT." The PPT system relied upon bar codes which a video store applied to its tapes. As such, PPT was designed as a paperless system. This system tracked tapes according to the title of the video, not whether the tape was in fact owned by Rentrak. Once a title was obtained from Rentrak, the PPT system recorded all transactions regarding that title regardless of whether the tape in question in fact came from Rentrak. The recorded transactions were electronically sent by the system to Rentrak's headquarters in Portland and reviewed nightly. Although Rentrak's witnesses testified that it employs regional auditors, no evidence was

presented that an auditor ever reviewed Video Odyssey's accounts.

Under this system, Rentrak was entitled to a portion of the rental proceeds of the tapes which were not Rentrak's property.[1] At trial, Rentrak's witnesses testified that this requirement was intended to encourage a store owner to deal exclusively with Rentrack with regard to any particular title. Both prior to and subsequent to entering into the Agreement with Rentrak, Video Odyssey also dealt with other distributors.

Not all of the tapes at the store belonged to Rentrak. However, it was impossible under the PPT system to tell by looking at a tape whether the tape was provided by Rentrak or separately owned by the video store. Only by checking with the computer via the bar codes and the PPT system could one tell the actual ownership of any particular tape. As a result, any tapes sold without processing the sale through the computer system would neither show up on Rentrak's records nor alert the seller that Rentrak had an interest in the tape sold.

The Agreement did not require that Video Odyssey maintain the funds due Rentrak in segregated accounts. Instead, the funds went into the video store's general operating account. Accordingly, it is impossible to identify any funds as proceeds of any particular sale or lease. The evidence presented at the hearing was that Rentrak knew of this practice and endorsed it as part of the PPT system.

Video Odyssey experienced financial difficulties which eventually lead Sapp and Tucker to close the store. Sapp and Tucker sold the store to Debtor, who continued in business as Universal Video. Sapp and Tucker helped finance Debtor's purchase of Video Odyssey's assets by guarantying a loan on Debtor's behalf with a local bank. On June 13, 1990, Video Odyssey, Debtor and Rentrak agreed to transfer the Agreement to Debtor. Thereafter, Debtor became primarily liable under the Agreement. Although the transfer obligated Debtor to assume Video Odyssey's role under the Agreement, no inventory of tapes was taken at that time by any party. Rentrak's records custodian testified that no new tapes were ordered after April of 1990. Therefore, the evidence is that Debtor received no new tapes after taking over Video Odyssey's inventory, and that the tapes were at least 44 days old when Debtor received the inventory.[2]

Video Odyssey had been located in a duplex building at the time of the transfer. Debtor continued the video leasing business as Universal Video using approximately half of the floor space and inventory as Video Odyssey. Debtor did not obtain all of Video Odyssey's assets under the transfer and sale, but rather selected those tapes he wished and left the remainder in the unused portion of the duplex. Sapp testified that Tucker sold the remaining tapes. It is uncertain whether any of Rentrak's tapes were included in those sold by Tucker at that time, or whether those tapes were part of the inventory which Rentrak contends Debtor converted. The accounting procedures used by all parties in this case appear to be extremely sloppy.

Several witnesses testified that Debtor sold tapes without using the PPT system at a sidewalk sale and that Debtor sold tapes to other stores in order to meet business expenses. No witness was able to testify without supposition that Debtor sold any of Rentrak's tapes on these occasions.

Debtor operated Universal Video until December of 1990. At that time, Debtor experienced medical problems and "abandoned" the store. After Debtor ceased to operate Universal Video, Sapp and Tucker took over the business and sold off the remaining tapes to minimize their liability on their guarantee. No inventory of the tapes was taken by Sapp and Tucker prior to selling the tapes, and the PPT system was not used. Sapp and Tucker

---

1. It is not clear from the evidence whether Rentrak is entitled to a portion of the sales proceeds of tapes which were not Rentrak's property.

2. The evidence was not specific as to the date of the last shipment of tapes. The witnesses testified only that the last shipment occurred in April. Therefore, counting the period between the last shipment (assuming the end of April) and the transfer date of June 13, the Court finds that the tapes were at least 44 days old.

were only able to testify that it appeared that the majority of tapes were missing when they reentered the store after Debtor left. Despite Debtor's abandonment and the cessation of transmittal reports through the PPT system, Rentrak did not terminate the Agreement until August 5, 1991.

Rentrak brought suit against Debtor in the United States District Court for the District of Oregon. As part of its complaint, Rentrak stated that Debtor had failed to transmit the required transaction reports under the Agreement for 233 days prior to termination of the Agreement.[3] The parties stipulated to a judgment of $25,822.12 as well as $300 in attorney's fees. Rentrak has also pursued and received partial satisfaction of its claims from both Sapp and Tucker.

Rentrak contends that during the six months the store was open and under Debtor's control, Debtor sold some or all of the video tapes which were provided under the Agreement. Rentrak also complains that Debtor failed to remit the proceeds generated by the sale and lease of the videos. Although the parties have stipulated to a consent judgment as stated above, Rentrak now argues that Debtor is responsible for $81,296.53 representing the retail value of the lost tapes as well as $12,823.12 in leasing revenues which were not remitted. The entire debt, Rentrak contends, is nondischargeable.

### CONCLUSIONS OF LAW

The Court notes initially that the consent judgment entered into by Rentrak and Debtor in the Oregon proceedings is based on the same breach of contract and conversion claims that Rentrak bases its claims on in this case. A judgment was entered in favor of Rentrak in those proceedings. The doctrine of merger and bar precludes Rentrak from bringing another action on the same claim in this Court. *United States v. International Bldg., Co.*, 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953), *r'hng. denied,* 345 U.S. 978, 73 S.Ct. 1120, 97 L.Ed. 1392 (1953) (a consent judgment precludes relitigation of the same claim in later proceedings).

> '[W]here the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action; not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action.'

*Id.* at 504–505, 73 S.Ct. at 808–809 (*quoting Cromwell v. County of Sac,* 94 U.S. 351, 352–353, 24 L.Ed. 195 (1900)).

While a consent judgment cannot form the basis for res judicata or collateral estoppel, no such prohibition exists in the case of merger and bar. "A judgment is an absolute bar to a subsequent action on the same claim." *Id.* at 504, 73 S.Ct. at 808. The same set of facts may be relitigated in the face of a consent judgment only if a subsequent action is based on a different claim or demand. *Id.* at 504–506, 73 S.Ct. at 808–809. The claim Rentrak asserts in this case is for breach of contract and conversion. This is identical to the claim which was resolved by consent judgment in the Oregon court. Rentrak may no longer assert that claim, may not relitigate the same set of facts, and must now rely upon the judgment. Rentrak is therefore prohibited from asserting the same claim and seeking an award in this Court which is higher than that stipulated to in the prior litigation. The liability and damages flowing from Debtor's breach of contract and conversion have been determined and reduced to judgment. Rentrak's

---

**3.** This allegation is inconsistent with the testimony Rentrak offered at trial regarding the operation of the PPT system as a paperless system which automatically transmitted reports to Rentrak's headquarters on a nightly basis. The Court interprets this allegation to state that Rentrak did not receive PPT transmissions from Universal Video for 233 days prior to terminating the agreement.

claim in this bankruptcy case is limited to its judgment of $25,822.12 as established by the District Court of Oregon.

Having addressed the proper amount of Rentrak's claim in this case, the Court turns to issues of dischargeability. The same set of facts may be relitigated under the guidelines of the *International Bldg.* case where a different claim or demand is pursued. In this case, Rentrak pursues a claim of non-dischargability due to embezzlement and willful and malicious injury to its property. While the previous consent judgment in this case recited breach of contract and conversion as the basis for the judgment, embezzlement and willful and malicious injury are separate claims requiring separate proof which is not provided by the consent judgment. Therefore, the Court must look beyond the judgment to the circumstances which gave rise to the liability.

■ "The statutory exceptions to discharge in bankruptcy are narrowly construed, and the creditor opposing discharge must prove the debt falls within an exception to discharge." *Werner v. Hofmann,* 5 F.3d 1170, 1172 (8th Cir.1993) (*citing In re Belfry,* 862 F.2d 661 (8th Cir.1988)). Rentrak bears the burden of proving that Debtor embezzled the funds by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The preponderance of the evidence is defined as "'the evidence which, when weighed with that opposed to it as more convincing force and is more probably true and accurate. If upon any issue in the case, the evidence appears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then plaintiff has not met his or her burden.'" *Dahlgren & Co., Inc. v. Lacina (In re Lacina),* 162 B.R. 267, 272 n. 6 (Bankr. D.N.D.1993) (*quoting Smith v. United States,* 726 F.2d 428, 430 (8th Cir.1984)). Rentrak contends that Debtor's debt is nondischargeable under sections 523(a)(4) and 523(a)(6) of the Bankruptcy Code.

Sections 523(a)(4) and 523(a)(6) provide:

**4.** The Court has noted some discrepancy in the reported cases regarding whether state law definitions of embezzlement are applicable, or rather whether some federal common law definition is the correct application of the term. *Compare*

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. §§ 523(a)(4) & 523(a)(6) (West 1995).

■ Rentrak proceeds under the embezzlement provisions of section 523(a)(4), contending that Debtor embezzled the tapes and/or the proceeds of the sale of the tapes. These are distinct acts requiring separate analysis of the available evidence. While the consent judgment establishes a conversion in breach of the Agreement took place, the circumstances of the conversion will dictate whether the conversion amounts to embezzlement.

The Court finds some guidance in cases discussing embezzlement in the context of consignment, which is analogous to the facts of this case. Whether the sale of the tapes and the disposal of the proceeds constitutes an embezzlement or exemplifies a traditional debtor/creditor relationship is in question. In the case of *Sandalon v. Cook (In re Cook),* 141 B.R. 777 (Bankr.M.D.Ga.1992), the court addressed a complaint by a diamond importer alleging that the debtor embezzled a diamond which was provided to the debtor on consignment. The Court began with the premise that "'An embezzlement may be defined as (1) the fraudulent (2) conversion of (3) the property (4) of another (5) by one who is already in lawful possession. [citation omitted]. In order to find an embezzlement, the Court must find that a fraudulent conversion of the property took place.'" *Id.* at 782 (*quoting Kopelman & Shatz, Inc. v. Mastrangelo (In re Mastrangelo),* 34 B.R. 399 (Bankr.D.Mass.1983)).[4] The court reviewed

*Cook,* 141 B.R. at 781 and *National City Bank v. Imbody (In re Imbody),* 104 B.R. 830 (Bankr. N.D.Ohio 1989). In practice, the distinction does not make a difference as the definition of embezzlement appears to stem from common

the alleged embezzlement in two stages. The first stage was the sale of the diamond, and the second stage was the failure of the debtor to remit the proceeds of the sale.

Rentrak produced no direct evidence that Debtor in fact sold any of Rentrak's tapes. This is not fatal to Rentrak's complaint, since the required fraudulent intent and conversion may be proved by circumstantial evidence. As the court in *Skemp v. Michel (In re Michel)*, 74 B.R. 80 (Bankr.N.D.Ohio 1985) stated:

> Both the intent and the actual taking, however, may be proved by circumstantial evidence.... where, as here, the defendant alone has access to the property, a substantial shortage is disclosed, and no explanation of the shortage is tendered by the accused, the trier of fact may reasonably infer from the circumstances that the custodian of the property has embezzled the missing funds.

*Id.* at 87 (*quoting United States v. Walker*, 677 F.2d 1014, 1016 (4th Cir.1982)).

Debtor, however, did not have sole access to the tapes. No inventory was taken prior to selling the store to Debtor which would have confirmed the presence of the tapes at the time of the sale. Debtor did not take all of the tapes from Video Odyssey when he opened Universal Video, and Sapp testified that Tucker sold those tapes which Debtor did not want. It is as likely that some of Rentrak's tapes were sold at this time as later under Debtor's control. Moreover, when Debtor left Universal Video, Sapp and Tucker began to sell as many tapes as they could in order to reduce their exposure under the guarantee. Given the fact that it was impossible to tell from the face of a tape that it belonged to Rentrak, and that Sapp and Tucker did not pass the tapes they sold through the PPT system, it is also as likely that Rentrak's tapes were sold by these two individuals as by Debtor. The Court is faced with an evidentiary black hole regarding the fate of the tapes. At best, Rentrak has proved that Debtor, Sapp and Tucker alternately exercised control over the tapes, and

that, while under the separate control of these individuals, the tapes disappeared.

Debtor did not have exclusive access to the tapes. Due to the fact that no inventory was taken when Debtor took over the store, the Court cannot determine what shortage may be chargeable to Debtor. Several alternative explanations exist for the disappearance of the tapes.[5] However, testimony was presented that Debtor on several occasions sold tapes either at a sidewalk sale or to other video stores out of the back of a pickup truck. In such circumstances the PPT system was not available, and Debtor would not have known whether a tape belonged to Rentrak. Debtor would have been aware of this fact.

Weighing the circumstantial evidence presented by Rentrak, and due to the lack of precautions taken by Debtor, it is very likely that some of Rentrak's tapes were included in those tapes sold by Debtor on those occasions. Debtor would have been aware of this risk. If the Court were applying the pre–*Grogan* clear and convincing evidence standard, Rentrak would have failed to prove that Debtor was responsible for selling the tapes. However, under the preponderance of the evidence standard, Rentrak has proved that Debtor sold at least some of the tapes in which Rentrak held legal title. This is no more than the prior consent judgment for conversion already established.

The circumstances of the sale of the tapes do not demonstrate the fraudulent intent aspect of an embezzlement. The *Cook* court found it significant that the debtor had the authority under the agreement with the diamond importer to sell the diamond without prior approval by the importer. *Id.* at 784. The fact that the debtor sold the diamond outside the terms of the contract for consignment was of no import for the purposes of determining whether an embezzlement took place by the sale of the diamond. *Id.* at 784. A similar situation is before this Court. The testimony was undisputed that Debtor had the authority to sell the tapes under the

law principles. The common law definition seems to have made the transition into both state and federal usage with little or no alteration.

5. It is most probable that Sapp and Tucker sold some of them.

contract after a specified time period. The evidence at the hearing was that the tapes were at least 44 days old, and that tapes could be sold after a period of 45–90 days. Rentrak failed to identify with any degree of accuracy which tapes, if any, were still subject to the "hold back" period.

Rentrak has failed to prove by a preponderance of the evidence that the sale of the tapes constituted an embezzlement. At most, the sale of the tapes appears to amount to a breach of contract. The more troublesome aspect of this case lies in Debtor's failure to remit the proceeds of the sale and/or lease of the tapes. In the *Cook* case, the court found that while the sale of the diamond did not amount to an embezzlement, the failure to remit the proceeds of the sale was an embezzlement. The court found that the debtor converted the proceeds, and that the conversion was fraudulent due to the fact that the debtor lied to the importer regarding the fate of the diamond. *Id.* at 784. The court found the requisite intent to defraud in the fact that the debtor knew that the diamond belonged to the importer, and that he was obligated to pay most of the proceeds to the importer. The debtor knowingly applied the proceeds of the diamond to pay other creditors. This, the court found, was a fraudulent conversion of property sufficient to establish embezzlement. *Id.* at 784.

■ This Court agrees with the *Cook* court that in the context of a consignment the alleged embezzlement should be reviewed at two stages: the sale of the property and the disposal of the proceeds. The sale of the property in Debtor's case was contemplated under the Agreement, and hence the sale cannot be considered an embezzlement even if the sale amounts to a breach of contract. The fact that Debtor disposed of the proceeds of Rentrak's property and the funds generated by the lease of the tapes without remitting Rentrak's share under the Agreement makes this case similar to the *Cook* decision. However, the fact that Debtor was authorized by Rentrak to commingle funds adds an additional wrinkle to the analysis which was not present in the *Cook* case.

"A related exception to the embezzlement definition involves a debtor's right to commingle the funds which are owed." *National City Bank v. Imbody (In re Imbody),* 104 B.R. 830, 841 (Bankr.N.D.Ohio 1989) (*citing Commonwealth of Virginia Commission of Game and Inland Fisheries v. Myers (In re Myers),* 52 B.R. 901 (Bankr.E.D.Va.1985); *Crebbs v. Epperson (In re Epperson),* 45 B.R. 708 (Bankr.E.D.Tenn.1985)). In the *Myers* case, the court stated:

> Even where a case might imply some form of trust by virtue of a debtor holding funds for another, the debtor's subsequent appropriation of the funds will not amount to an embezzlement absent proof of the debtors' fraudulent intent. [citation omitted]. Moreover, the fraudulent intent which is a prerequisite to finding an embezzlement under § 523(a)(4) may be negated by the fact that the debtor used such funds openly, without attempting to conceal, and had reasonable grounds to believe he had the right to so use.

*Id.* at 905 (*citing Matter of Storms,* 28 B.R. 761, 765 (Bankr.E.D.N.C.1983)).

■ Where a consignment agreement purportedly provides the basis for an embezzlement complaint, such as the Agreement before the Court, the actions of the parties control over the terms of the agreement. *Id.* at 906 (*citing In re Rigsby,* 18 B.R. 518 (Bankr.E.D.Va.1982)). Where a debtor is not required to isolate funds in a separate account and has unrestricted use of the funds, the complainant is merely an unpaid creditor rather than the victim of embezzlement. *Id.* at 906; *See also Air Traffic Conference of America v. Chick (In re Chick),* 53 B.R. 697 (Bankr.D.Or.1985).

In the present case, Rentrak did not require any separate maintenance of the funds due under the Agreement. The funds from the lease or sale of a tape covered by the Rentrak Agreement were pooled with Debtor's operating funds and spent without restriction. To be certain, Rentrak expected to be paid its due periodically, but expectation of payment is universal to any creditor, whereas embezzlement depends upon a fraudulent misappropriation of another's property.

The Court finds significant the fact that the creditor in the *Myers* case required the same type of accounting as does Rentrak in this case. To wit: "It appears from the evidence that as long as the [creditor] received a check from the debtors covering the amount due, it made no difference as to the manner in which the funds were maintained." *Id.* at 906. This observation is important since a debtor who is authorized to use the proceeds of a sale or lease without restriction cannot be said to have fraudulently misappropriated the funds when the debtor uses the funds to pay other creditors. In such a case, the *Myers* court found that the debtors' "duty to pay the [creditor] was based solely upon their obligations as a debtor [sic]." *Id.* at 907. Without the requisite fraudulent deprivation, the court found that no embezzlement had taken place. *Id.* at 907.

Similarly, this Court cannot find that Debtor embezzled the proceeds of the tapes when he was authorized to use those funds in the everyday operation of his store. All the evidence points to the conclusion that Debtor did just that. *Werner*, 5 F.3d at 1172 ("The embezzlement exception requires that the debtor improperly used the creditor's property before complying with some obligation to the creditor."). Rentrak is a creditor, and not the victim of embezzlement. Therefore, Rentrak has failed to demonstrate that its judgment is nondischargeable under section 523(a)(4).

■ Rentrak also proceeds under the theory that the debt is nondischargeable pursuant to section 523(a)(6) for willful and malicious injury to Rentrak's property. In the cases of *Hope v. Walker (In re Walker)*, 48 F.3d 1161 (11th Cir.1995) and *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52 (11th Cir.1995), the Eleventh Circuit Court of Appeals enunciated the applicable standards for an action under section 523(a)(6). In *Walker*, the court addressed the contention that the failure to obtain worker's compensation insurance constituted willful and malicious injury. The court found that it did not. In doing so, the court defined willful and malicious injury in the context of 11 U.S.C. § 523(a)(6). The court stated:

[I]n order to be "willful" under section 523(a)(6), the debtor must have intended more than merely the act that results in injury. Congress has been very clear in expressing its intention in section 523(a)(6). The plain language of section 523(a)(6) excepts from discharge debts arising from "willful and malicious injury" rather than "willful and malicious acts which cause an injury." ... Mindful of our obligation to construe strictly exceptions to discharge in order to give effect to the fresh start policy of the Bankruptcy Code, [citation omitted], we hold that section 523(a)(6) requires a deliberate or intentional injury....

Because Congress reenacted section 523(a)(6) in the context of the common law, we conclude that a debtor is responsible for a "willful" injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury. [citation omitted].

*Id.* at 1164–1165.

As discussed above, Debtor was under no obligation as to the proceeds of the sale or lease of a Rentrak tape beyond the "hold back" period and the eventual remittance of Rentrak's portion of the proceeds. Debtor was able to sell the tapes under the terms of the Agreement and was authorized to commingle the proceeds for use in Universal Video's general operating account. However, Debtor's knowing failure to use the PPT system when he sold the tapes is a concern.

Evidence was presented that Debtor sold some tapes at a sidewalk sale, and others to various video stores out of the back of a pickup truck. Neither method of sale utilizes the PPT system. However, the sale without the use of the PPT system is merely a breach of the contract. The injury arises from Debtor's failure to remit a portion of the proceeds of the sale or lease. Thus, the *Walker* decision's distinction between the willful and malicious act which causes injury and the willful and malicious injury comes into play. The act of selling the tapes is not the focus. Rather, Debtor's actions with regard to the proceeds from the tapes is central to the analysis.

The evidence shows that Debtor used the proceeds of the tapes to meet his payroll and other operating expenses. Rentrak presented no evidence that the funds in the general operating account were used for any other purpose. The evidence does not support a finding that Debtor intended to injure Rentrak, but rather that Debtor used the proceeds from the tapes contained in the general operating account to keep Universal Video afloat.

Neither was Debtor's use of the funds to operate the store substantially certain to cause injury, which is the second consideration under the *Walker* decision. The Agreement which is the subject of this suit provides that Debtor may use the proceeds of the tapes in this fashion. While Debtor's continued use of the proceeds of the sale or lease of videos to meet operating expenses was in reckless disregard of his duties to Rentrak when it became clear that he could not pay Rentrak as well as the store's other creditors, reckless disregard does not rise to the level of willful and malicious injury. *Id.* at 1165. Hence, under rationale of the *Walker* decision, Debtor did not commit a willful and malicious injury.

In the *Wolfson* decision, the debtor pledged horses as collateral for several loans. The debtor routinely deposited the proceeds from the sale of the horses into the farm's general operating account, and used the proceeds to pay both the secured creditor and other bills. Whatever the debtor could not pay to the secured creditor was added to the overall indebtedness. The secured creditor knew of this practice, and continued to extend credit to the debtor's farm. A number of the loans went into foreclosure. The secured creditor sued, claiming that the debtor had committed a willful and malicious injury to its property by converting the proceeds of the sale of the horses to his own use. *Id.* at 53.

The Eleventh Circuit stated that willful and malicious conversion may constitute the type of nondischargeable injury governed by section 523(a)(6). *Id.* at 54. However, not every conversion of property will rise to the level of willful and malicious injury. *Id.* at 54. The court stated:

While under 11 U.S.C. § 523(a)(6), discharge is not permitted where there has been "willful and malicious injury by the debtor to another entity or to the property of another entity," the U.S. Supreme Court has observed that such an injury "does not follow as of course from every act of conversion, without reference to the circumstances," *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). In some circumstances, found the Court, "[t]here may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a wilful and malicious one." [citations and footnotes omitted].

*Id.* at 54.

In *Wolfson,* the court found it significant that the creditor had acquiesced in the debtor's business practices which placed the creditor's collateral in jeopardy. The creditor knew that the debtor had placed the proceeds of the creditor's collateral into a general operating account, and used these funds to pay ordinary business expenses. The creditor continued to extend credit despite this fact. Such complicity on the creditor's part was sufficient to remove the admitted conversion from the reach of section 523(a)(6). In such a case, the creditor cannot complain that the debtor took inadequate care of the creditor's property, or that the conversion was done willfully and maliciously. *Id.* at 54.

The present case shares many similarities with the facts of the *Wolfson* case. Rentrak knew that the proceeds from the sale or lease of the tapes was being used by Debtor to fund and operate his video store. Rentrak took no steps to ensure that its tapes or the proceeds of its tapes would be protected. Rentrak would submit a bill periodically which Debtor would pay from whatever funds were available in the general operating account. Debtor was authorized to sell the tapes after a "hold back" period, and Rentrak produced no evidence that any tapes were sold in violation of this portion of the Agreement. Debtor was authorized to use the proceeds of the sale or lease of a tape in running his store, and he did just that.

There was some evidence that the manner in which Debtor sold the tapes was inconsistent with the operation of the PPT system in that the system would not record the transaction. This, however, does not change the fact that Rentrak acquiesced to Debtor's use of the proceeds of the sale and lease of the tapes.

The *Wolfson* court ultimately found that the creditor had waived its right to assert nondischargeability because of the creditor's own negligence with regard to its collateral. The court found that the creditor did not take the steps which were available to it to protect its own collateral. Similarly, Rentrak did not exercise the options it had to protect itself from the damage caused by Debtor's breach of contract and conversion.

Rentrak produced evidence that the PPT transactions were reviewed nightly, and that Rentrak would contact stores if the electronic reports showed that tapes were not performing as expected. Debtor "abandoned" the store in December of 1990. However, Rentrak did not terminate the Agreement until August 5, 1991. While a slight variance in transmissions may be understandably overlooked from night to night, Rentrak was aware that Debtor was not making *any* transactions with regard to the Rentrak tapes for a period of over eight months. Given the fact that a substantial number of tapes in Universal Video were Rentrak tapes, this should have been seen as a large red flag.

As evidenced by the demand letter submitted by Rentrak, Debtor was in default on the Agreement as early as October 9, 1990.[6] Rentrak knew that Debtor was in default on the Agreement for a minimum of eleven months before terminating the Agreement. Rentrak produced evidence that it employed regional auditors, and yet no auditor ever reviewed Debtor's accounts or inventory.

The Court finds that Rentrak had sufficient evidence to strongly suspect Debtor's breach of contract in time for it to take steps to protect its property. Rentrak failed to take such reasonable steps as an ordinarily prudent person would in like circumstances.

Under the *Wolfson* decision, section 523(a)(6) will not except discharge of this debt.

In sum, Debtor's failure to use the PPT system amounts to a violation of the Agreement, and Debtor's failure to remit Rentrak's portion of the sale or lease proceeds is a conversion. However, due to the course of action between these parties, the Court cannot find that Debtor embezzled Rentrak's property. Debtor was authorized to sell the tapes and use the proceeds of the sale or lease in the general operating account of Universal Video. The fact that Debtor did not have sufficient funds after paying other creditors to pay Rentrak does not mean that Debtor is guilty of embezzlement. Rentrak failed to proved the requisite fraudulent intent to deprive, and section 523(a)(4) will not prevent the discharge of Debtor's debt.

Debtor's breach of contract and conversion did not amount to a willful and malicious injury to Rentrak's property. The injury did not stem from Debtor's use of Rentrak's property, or the fact that Debtor sold the property. Both of these eventualities were contemplated under the Agreement. The injury was caused by the fact that Debtor did not have enough funds available at the end of the day to pay both Rentrak and the remainder of his creditors. Rentrak has failed to prove from this set of facts that Debtor intended to injure Rentrak, or that his use of the proceeds according to the terms of the Agreement was substantially certain to cause harm. To the extent that this is a foreseeable eventuality under the terms of the Agreement, Debtor is not chargeable with malicious injury.

Rentrak's own behavior played a part in its eventual injury. Rentrak knew for eleven months that Debtor was in breach of the Agreement and was not using the PPT system. Despite this fact, no inventory of tapes was taken and no on site inquiries were made to account for the funds allegedly due to Rentrak under the Agreement. Rentrak allowed Debtor to continue to use the Rentrak tapes, even after a reasonable person would have terminated the agreement and/or conducted an on site inventory and accounting.

---

6. Rentrak also failed to show that Debtor even responded to the demand letter. This alone should have placed Rentrak on notice that it needed to take steps to protect its collateral.

Under the authority of the *Wolfson* decision, section 523(a)(6) is unavailable to Rentrak. Rentrak has failed to prove its case with respect to either 11 U.S.C. §§ 523(a)(4) or 523(a)(6).

An order in accordance with this memorandum opinion will be entered on this date.

### *ORDER*

In accordance with the Memorandum Opinion entered this date, it is hereby

ORDERED that the judgment obtained by Plaintiff Rentrak Corporation against Debtor/Defendant James Edward Cady, Jr., detailed in the accompanying Memorandum Opinion, is determined to be dischargeable in the above designated Chapter 7 bankruptcy case.