In re Matthew **WRIGHT**, Debtor.

Prentice J. Bennett, Plaintiff,

v.

Matthew Wright, Defendant.

Bankruptcy No. 01-53376-JDW.
Adversary No. 01-5154.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

June 10, 2002.

John K. James, Warner Robins, Georgia, for plaintiff.

Joy Webster, Macon, Georgia, Chapter 7 Trustee.

## MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Plaintiff Prentice Bennett's Complaint to Determine Dischargeability of Debt. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I). The court held a trial to hear evidence on April 16, 2002. Following trial, the parties presented written briefs. After considering the pleadings, the evidence, the briefs, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Debtor Matthew Wright is a co-shareholder and co-operator of Wright Seeds, Inc., a corporation that processes and resells grain seeds. Plaintiff Prentice Bennett is a farmer who has done business with Wright Seeds since the late 1970s or early 1980s. At issue is money Wright Seeds owes to Bennett for crops he produced and delivered to Wright Seeds in 1998, 1999, and 2000. Although the parties had previously executed contracts to memorialize their obligations, no written contracts were in force between them for the years in question.

Despite the lack of a written contract, the parties agree that they had a "handshake" understanding as follows: In the year prior to harvest, Bennett would obtain wheat and oat seeds worth about $2,000 from Wright Seeds. Bennett would then plant the seeds and harvest the crops

Wesley J. Boyer, Macon, Georgia, for debtor.

the following year. In May, June, or July, he would deliver the harvest to Wright Seeds, which would clean, bag, and resell the seeds. In December, Wright Seeds would pay Bennett for the harvest he delivered, offset by the approximately $2,000 Bennett owed Wright Seeds. The parties dispute when Wright Seeds could sell the seeds delivered by Bennett and whether it could do so without Bennett's permission. The parties also dispute who owned the seeds after they were delivered to Wright Seeds and the amount owed by Wright Seeds to Bennett.

All the oat and wheat seeds delivered to Wright Seeds in 1998 and 2000 were subject to government liens for loans made to Bennett by the Farm Service Agency through the United States Department of Agriculture's Commodity Credit Corporation ("CCC"). The government required the grain to be segregated and tagged, which Wright Seeds did. The government also made periodic inspections to check on its collateral. In 1998 a representative of the Farm Service discovered that all the wheat and oat seeds produced by Bennett had been sold. The representative informed Wright that the loans had to be paid. The same scenario was played out in 2000. Wright Seeds made a payment on the note secured by the 1998 oats.[1] Wright Seeds made no other payments on the outstanding loans for the 1998 or 2000 crops. All remaining outstanding balances were repaid in full by Bennett.

Bennett testified that, in the usual course of dealings between the parties, he allowed Wright to pay him in December so that Wright could establish cash flow. However, Bennett testified that he did not expect Wright to sell his seeds to generate that cash flow, and Wright was not to sell the seeds without Bennett's permission. Wright testified that in his experience he could sell the seeds at any time. When the seeds served as collateral for government loans, Wright believed he could sell the seeds so long as the loans were repaid within a short window after the sale. Wright also testified that he had intended to pay Bennett for all the seeds Bennett had delivered and that he had been trying to earn the money to do so. Bennett testified that he continued to do business with Wright Seeds despite its failure to pay him because he believed Wright's assurances that he would be paid in full and because Wright had always paid him in the past.

Rather than paying Bennett with the proceeds from the 1998, 1999, and 2000 sales of Bennett's seeds, Wright used the money to pay operating expenses of Wright Seeds, including paying other creditors, some of whom may have had their debts personally guaranteed by Wright. Bennett testified that he did not require Wright to keep the proceeds of the sales in an account separate from the Wright Seeds general operating account.

Wright filed a Chapter 13 petition on August 6, 2001, when foreclosure proceedings began on his parents' house, on which he was a cosigner. The case was converted to Chapter 7 on September 13, 2001. Bennett filed this adversary proceeding seeking to have the debt owed him declared nondischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6). The parties presented evidence during a trial held on

---

1. How much the company paid is unclear. Testimony from Bennett on cross-examination indicated that Wright paid approximately $3,300. However, a Loan Repayment Receipt from the CCC shows one payment of $2,020.98, with a handwritten notation that the payment was made by Wright Seeds. (Plaintiff's ex. 6, p. 5.) A second receipt for the same crop shows a payment of $1,335.36 but does not indicate who made the payment. (Pl.'s ex. 6, p. 4.)

April 16, 2002 and set forth their legal arguments in written briefs.

### Conclusions of Law

■■■ Bennett seeks to have his claim excepted from discharge under Sections 523(a)(4) and (a)(6) of the Bankruptcy Code. The nondischargeability provisions of Section 523 are narrowly construed in favor of the debtor. *Rentrak Corp. v. Cady (In re Cady)*, 195 B.R. 960, 964 (Bankr.S.D.Ga.1996) (Walker, J.). The party opposing discharge has the burden to prove his case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

#### *Section 523(a)(4)*

Plaintiff first alleges that the debt is nondischargeable under Section 523(a)(4), which provides, "(a) A discharge under section 727 … of this title does not discharge an individual debtor from any debt—(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny…." 11 U.S.C.A. § 523(a)(4) (West 1993). The Court will examine each of the bases for nondischargeability under this section in turn.

■■■ To prove either fraud or defalcation in a fiduciary capacity, Bennett must show the existence of a fiduciary relationship. In a determination of discharge proceeding, "fiduciary capacity" is narrowly construed to include only technical or express trusts. *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir.1993); *Farmers & Merchants Bank v. Brinsfield (In the Matter of Brinsfield)*, 78 B.R. 364, 369 (Bankr.

M.D.Ga.1987). Such a trust may arise by statute or by common law, but it must have been in existence prior to the alleged wrongdoing and, therefore, does not include constructive or resulting trusts. *Smith Drug Co. v. Pharr–Luke (In the Matter of Pharr–Luke)*, 259 B.R. 426, 431 (Bankr.S.D.Ga.2000); *Utica Mut. Ins. Co. v. Johnson (In re Johnson)*, 203 B.R. 1017, 1021 (Bankr.S.D.Ga.1997).

■■■ Courts have crafted slightly varying criteria for establishing fiduciary capacity, but in general they require identification of the fiduciary and fiduciary duties "specifically set forth so that a trust relationship is expressly and clearly imposed." *Eavenson v. Ramey*, 243 B.R. 160, 165 (N.D.Ga.1999). In the case of a statutory trust, the plaintiff also must show "legislative design to create a trust." *Georgia Lottery Corp. v. Daniel (In re Daniel)*, 225 B.R. 249, 251 (Bankr.N.D.Ga. 1998). Some courts also require an identifiable trust res or identifiable beneficiaries. *Church v. Hanft (In re Hanft)*, 274 B.R. 917, 924 (Bankr.S.D.Fla.2002); *Eavenson*, 243 B.R. at 165. Fiduciary capacity does not arise from ordinary commercial relationships. *Brinsfield*, 78 B.R. at 369.

■■■ Plaintiff has cited two statutes that he claims create a trust, O.C.G.A. §§ 11–9–315(a)(1) [2] and 11–7–204(1).[3] However, neither statute imposes any fiduciary duties. In *Quaif*, the Eleventh Circuit Court of Appeals found that a provision of Georgia's insurance code created a trust because it required an insurance agent to "promptly account for and remit payments

---

**2.** "A security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien…." O.C.G.A. § 11–9–315(a)(1) (Supp.2001).

**3.** "A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances…." O.C.G.A. § 11–7–204(1) (1994).

of funds to the insurer" and forbade the agent from "commingling the funds with his operating or personal accounts." 4 F.3d at 954. No equivalent language can be found in either of the statutes cited by Bennett. Section 11–9–315(a)(1) merely states that unless authorized by the secured party, the sale of collateral does not release the security interest on that collateral. The provision sets forth no duties, fiduciary or otherwise. Section 11–7–204(1) requires a warehouseman to exercise reasonable care to prevent loss or injury to goods in his keeping. The statute merely imposes a standard of care, not affirmative fiduciary duties. Bennett also claims that a common-law trust was created between the parties. However, he has cited no cases supporting this proposition.

 The only fiduciary-type duty revealed by the evidence was the requirement that the seeds subject to the government lien be segregated. However, this arises from the creditor-debtor relationship between CCC and Bennett. Creditor-debtor relationships do not impose fiduciary duties, particularly on third parties. *See Brinsfield,* 78 B.R. at 369. Furthermore, although Wright may have agreed to segregate the grain as required by the CCC, "mere agreement to segregate [the seeds] does not create a fiduciary relationship." *P.F.C. Mgmt. Corp. v. Chomat (In re Chomat),* 216 B.R. 681, 685 (Bankr.S.D.Fla.1997).

Because Bennett has cited no statute or case that designates Wright as a fiduciary of Bennett or imposes fiduciary duties on Wright, the Court concludes that Wright did not act in a fiduciary capacity; therefore Bennett has failed to meet his burden as to fiduciary fraud or defalcation.

 Bennett also alleges embezzlement and larceny. Embezzlement requires the fraudulent conversion of another's property by one who was lawfully in possession of the property. *Cady,* 195 B.R. at 964. Larceny requires a felonious taking of property with the intent to convert it or to permanently deprive the owner of it. *Southern Concrete Constr. Co. v. Lennard (In re Lennard)* 245 B.R. 428, 433 (Bankr.M.D.Ga.1999) (citing *Weinreich v. Langworthy (In re Langworthy),* 121 B.R. 903, 907–08 (Bankr.M.D.Fla.1990)). Both embezzlement and larceny require fraudulent intent. *Ploetner–Christian v. Miceli (In re Miceli),* 237 B.R. 510, 516–17 (Bankr.M.D.Fla.1999); *Lennard,* 245 B.R. at 433. The Court may infer intent from circumstantial evidence. *Miceli,* 237 B.R. at 514.

In *Sandalon v. Cook (In the Matter of Cook),* 141 B.R. 777, 784 (Bankr.M.D.Ga. 1992), the court found that the debtor, a diamond broker, embezzled the proceeds of a diamond he held on consignment from a diamond supplier. The debtor sold the diamond for about $42,500, paid $10,000 to the supplier as a "deposit," and paid other debts with the remaining money. However, the debtor told the supplier that he had not sold the diamond, but merely had a prospective buyer. *Id.* at 779. Because the debtor lied to the supplier about the disposition of the diamond, the court concluded that the debtor "intended to defraud" the supplier. *Id.* at 784.

 In *Cady,* the court reached a different conclusion. The debtor ran a video rental store and received videos from several suppliers. Under his agreement with one supplier, if he sold any of that creditor's tapes, he was obligated to remit a portion of the proceeds to the creditor. The agreement between the parties did not require the debtor to segregate the proceeds of sales of the creditor's videos. The debtor sold tapes that had been supplied by the creditor, but he failed pay the creditor any of the proceeds. 195 B.R. at

961–63. The court concluded that the debtor lacked fraudulent intent because he was not required to segregate the proceeds, and he had used them openly without any attempt to conceal his actions. *Id.* at 966. Furthermore, so long as the creditor received payment, there were no restrictions on the debtor's use of the proceeds. *Id.* at 967. "This observation is important since a debtor who is authorized to use the proceeds of a sale or lease without restriction cannot be said to have fraudulently misappropriated the funds when the debtor uses the funds to pay other creditors." *Id.* The court refused to find embezzlement when the debtor "was authorized to use those funds in the everyday operation of his store" and "all the evidence points to the conclusion that Debtor did just that." *Id.*

In *Cook,* "the conversion was fraudulent due to the fact that the debtor lied to the importer regarding the fate of the diamond." *Id.* at 966 (citing *Cook,* 141 B.R. at 784). But the facts in this case more closely resemble those in *Cady.* No evidence was presented to show that Wright took steps to conceal the sale of Bennett's seeds. To the contrary, in 1998 he allowed access to the Farm Service inspector. When the inspector asked about the missing seeds, Wright told the inspector it had been sold. A similar incident occurred in 2000.[4] Furthermore, Bennett testified that although he expected Wright to sell his seeds, he did not expect Wright to do so in order to pay Bennett. From this statement, the Court concludes that Bennett did not expect to be paid from the proceeds of the sale of his seeds. Furthermore, he did not require Wright to keep the proceeds in a separate account. Thus, here, as in *Cady,* Wright Seeds could use the proceeds of the sale of

Bennett's seeds without restriction and cannot be said to have fraudulently misappropriated the proceeds by using them to pay other creditors. *Id.* at 967. The facts in this case show that Wright acted without fraudulent intent and, therefore, did not embezzle Bennett's seeds or proceeds from the sale of the seeds.

With respect to larceny, Bennett has failed to demonstrate fraudulent intent. In *Lennard,* the debtor was a construction contractor. He received supplies from the creditor, used those supplies to complete construction projects, but never paid the creditor. The debtor testified that he had, at all times, intended to repay the creditor. 245 B.R. at 430, 433. As a result, the court concluded that the creditor had failed to prove the intent element of larceny. *Id.* at 433. Similarly, in this case, Wright testified on cross examination that he was trying to earn the money to pay Bennett for the 1998, 1999, and 2000 harvests. On direct examination, he testified that he intended to pay Bennett for the seeds. The Court finds Wright's testimony to be credible, and Bennett has presented no evidence to contradict it. In fact, Bennett testified that he believed Wright intended to pay him. Therefore, the Court concludes that Bennett has failed to prove the requisite intent to establish larceny.

### Section 523(a)(6)

Plaintiff also argues that the debt is nondischargeable under Section 523(a)(6), which provides, "(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—(6) for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C.A.

---

4. The parties did not explain how Bennett learned his seeds had been sold in 1999. However, Bennett does not allege that Wright attempted to conceal the sale.

§ 523(a)(6) (West 1993). An injury is willful when the debtor had specific intent to inflict the injury or the injury was substantially certain to result. *Ford Motor Credit Co. v. Moody (In re Moody)*, 277 B.R. 865, 870–71 (Bankr.S.D.Ga.2001) (Walker, J.); *see also Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). To be malicious, the injury must be "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir.1995) (citations and internal quotation marks omitted). An officer or majority shareholder of a corporation may be liable in his individual bankruptcy for a willful and malicious injury inflicted by the corporation if he actively participated in the infliction of that injury. *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559–60 (11th Cir.1987).

In *Owens*, the Eleventh Circuit Court of Appeals held that because the president of the corporation actively participated in the conversion of the creditor's collateral, the debt was not dischargeable in the president's personal bankruptcy. *Id.* In *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52, 54 (11th Cir.1995), the court reinforced the principle that conversion of collateral can be a willful and malicious injury. However, it noted that

> such an injury "does not follow as of course from every act of conversion, without reference to the circumstances." In some circumstances, . . . "[t]here may be an honest, but mistaken belief, *engendered by a course of dealing*, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a wilful and malicious one."

*Id.* (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934)) (internal citations omitted).

In one aspect, the facts in this case differ significantly from those in *Owens* and *Wolfson*. In both *Owens* and *Wolfson*, the property sold was collateral for a debt owed by the debtor to the creditor. 56 F.3d at 53, 807 F.2d at 1557. In this case, the property is collateral for a debt owed by the creditor to a third party. Otherwise, the facts more closely resemble those in *Wolfson*. Unlike the creditor in *Owens*, Bennett has not proven a contractual requirement that the *proceeds* of the sale be submitted to either the creditor or the government. 807 F.2d at 1557. Nor was there any requirement that the proceeds be held in a separate account. *Id.* Rather the facts indicate that Bennett "knowingly acquiesced in [Wright's] business practices and took no steps to protect" his property. 56 F.3d at 54. Furthermore, Bennett "not only knew of and failed to object to [Wright's] sales of [the seeds] and its business practice of depositing all proceeds into a general business account," but Bennett also continued to store its seeds at Wright Seeds despite Wright's failure to pay him. *Id.* at 54–55. Bennett failed to enforce the rights he believed he had in the seeds and continued doing business with Wright despite the alleged conversion. Even assuming there were a conversion for which Wright could be held liable, Bennett's "failure to take reasonable steps to protect [his property] . . . prevent[s] application of the [willful and malicious injury] exception." *Id.* at 55 (quoting *Meeker v. McGinnis (In re McGinnis)*, 586 F.2d 162, 165 (10th Cir. 1978)).

## Conclusion

In conclusion, Bennett has failed to meet his burden of proof under both Sections 523(a)(4) and 523(a)(6). He failed to show

that Wright acted in a fiduciary capacity for purposes of fiduciary fraud or defalcation, and he failed to demonstrate that Wright had the requisite intent for either embezzlement or larceny. Finally, the sale of Bennett's seeds and subsequent use of the proceeds to pay creditors other than Bennett did not cause willful and malicious injury because Bennett was aware of the actions and continued to do business with Wright Seeds without taking any steps to prevent a recurrence of the actions.