IN RE: Michael Eugene CLONINGER, Debtor,

William Edward Cloninger, Plaintiff,

v.

Michael Eugene Cloninger, Defendant.

CASE NO. 11–83163–pwb
Adversary No. 12–5343–PWB

United States Bankruptcy Court,
N.D. Georgia, Atlanta Division.

Signed March 17, 2016

Filed March 18, 2016

---

William Edward Cloninger, Perry, FL, pro se.

Michael Eugene Cloninger, Canton, GA, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Paul W. Bonapfel, U.S. Bankruptcy Court Judge

The Chapter 7 Debtor, Michael Eugene Cloninger, served as the personal representative for the estate of his deceased mother, Betty Joyce Cloninger, in Broward County, Florida. His brother, the Plaintiff William Edward Cloninger, timely commenced this adversary proceeding for a determination that a debt he asserts against the Debtor arising from the administration of the estate is excepted from discharge under paragraphs (2), (4), and (6) of 11 U.S.C. § 523(a).[1] Both the Plaintiff and the Debtor are proceeding *pro se.*

---

1. *See* Order Amending March 1, 2012 Order With Regard to Objection Filed by William E. Cloninger on Motion for Rehearing of William E. Cloninger and Order Reopening Case, Case No. 11–83163, Docket No. 28 (dated May 1, 2015, entered May 2, 2012). The Order permitted the Plaintiff to file an adver-

sary proceeding for a determination of the dischargeability of the debt within 30 days from the date of its entry. Because the Plaintiff is incarcerated in Florida, timely filing occurred on May 30, 2012, when he delivered his complaint to the appropriate prison offi-

At the time of her death on October 16, 2004, Ms. Cloninger owned a home (6210 S.W. 16th Street, North Lauderdale, Florida) encumbered by a mortgage held by CitiFinancial Equity Services, Inc. ("CitiFinancial"). She also had a $50,000 life insurance policy with American Health and Life Insurance Company ("AHLIC"). The primary beneficiary of the life insurance policy was CitiFinancial, to the extent of the debt owed on the mortgage. The Debtor was the secondary beneficiary.

The Probate Division of the Circuit Court of Broward County (the "Probate Court") authorized the sale of the home before AHLIC agreed to pay the death benefit on the AHLIC policy. The debt to CitiFinancial was paid from the proceeds of the sale. AHLIC later paid the entire death benefit to the Debtor, approximately $51,000 with interest, as the secondary beneficiary because the debt to AHLIC had already been satisfied.

The Plaintiff asserts that their mother intended that the death benefit be used to pay down the mortgage for the benefit of all of her four children: the Plaintiff, the Debtor, and their two sisters. If CitiFinancial had received the death benefit prior to the closing of the sale of the home, the debt would have been reduced by approximately $51,000, thus increasing the net proceeds from the home to be distributed to the four siblings by $12,750 each.

The Plaintiff contends that the Debtor wrongfully received the entire death benefit and that the Debtor is liable to him for his share, $12,750. The Plaintiff contends that the Debtor should have directed the payment of the death benefit to their mother's estate rather than to himself for his personal benefit. The Plaintiff's claims are that the Debtor engaged in actual fraud, breached his fiduciary duties as personal representative of their mother's estate, and willfully and maliciously deprived him of his entitlement to $12,750. He claims that the debt is excepted from discharge under paragraphs (2), (4) and (6) of 11 U.S.C. § 523(a).

The Debtor denies that he committed fraud, breached any fiduciary duty, or acted wrongfully. He explains that a prompt sale of the home was necessary in order to avoid foreclosure because no one was able to make mortgage payments after Ms. Cloninger died and that the timing of the payment of the death benefit occurred because AHLIC did not promptly pay the death benefit pending an investigation of the cause of Ms. Cloninger's death and whether it had grounds for denying the claim.

## I. PROCEDURAL BACKGROUND

On February 13, 2015, the Court entered an Order (the "February 13 Order") with regard to procedures for a trial. [Docket No. 49]. In view of the facts that both parties are proceeding without attorneys and that the Plaintiff would have to participate in the trial telephonically, the Court listed the facts that appeared to be undisputed (February 13 Order, Attachment A) and prepared a list of documents in the record that appeared to be relevant and material. (February 13 Order [Docket No. 49], Attachments A and B). In a separate Order, the Court attached copies of the documents and directed that the Clerk mail it to each of the parties. [Docket No. 51].

The February 13 Order directed the parties to object to the stipulation of any of the facts listed on Attachment A or to the admission of the documents listed on Attachment B on or before March 26, 2015. [Docket No. 49 at 6, 8]. The Order

---

cial for mailing to this Court. *See* Complaint [Docket No. 1].

also directed the parties to identify any other documents they wanted to use as evidence and state any objections to the Order. [Docket No. 49 at 8].

The Debtor's response stated that he had no objections to either attachment, other than a correction for the date of death of Ms. Cloninger. [Docket No. 56]. The Plaintiff's response likewise stated no objection to the attachments, but requested that the Court consider additional documents that he attached to his response. [Docket No. 57].

The February 13 Order scheduled a nonevidentiary hearing for April 9, 2015, with regard to any objections to the Order, to the stipulation of facts on Attachment A, or to the admissibility of documents listed on Attachment B. [Docket No. 49, at 8–9]. The Debtor personally appeared at the hearing, and the Plaintiff appeared telephonically. (See Order on Pending Motions; Confirming Agreement of Parties for Determination Based on the Record Without Trial; and Briefing Schedule (the "April 10 Order"), Docket No. 58 (dated April 9, 2015, entered April 10, 2015)).

At the April 9 hearing, neither party asserted any objections to the facts as stated on Attachment A (other than correction of the date of their mother's death) or to the admissibility of documents listed on Attachment B. The Debtor did not have any objection to the admissibility of the additional documents the Plaintiff attached to his response. [Docket No. 57].

In view of the agreement of the parties with regard to the facts and the absence of any objections to the documents, the April 10 Order stated that, with the correction for the date of Ms. Cloninger's death, "the Court deems all of the facts as stated on Attachment 'A' to be undisputed and part of the record for the Court to consider in the determination of this matter, as discussed below." (April 10 Order at 3).

At the hearing, the parties also agreed to a determination of this adversary proceeding on the basis of the record without a trial. Specifically, "[e]ach party agreed on the record to determination of this matter on the basis of the stipulated facts, the documents listed on Attachment 'B' to the February 13 Order and to the Plaintiff's Response [Docket No. 57] and other matters of record in this adversary proceeding or in the Debtor's bankruptcy case." (April 10 Order at 4).

In accordance with the agreement of the parties, therefore, the April 10 Order provides that the Court will "determine all issues with regard to the merits of this adversary proceeding on the basis of the record before the Court and will resolve any disputes of fact that are relevant or material to the legal issues based on the record and without a trial." (April 10 Order at 4).

In accordance with the briefing schedule set by the Court's Orders, the Debtor submitted his "Brief, Memorandum of Law, Summary" [Docket No. 61], and the Plaintiff filed his "Reply Brief and Memorandum of Law" [Docket No. 67] and his Affidavit. [Docket No. 68].[2]

---

**2.** The Plaintiff on June 5, 2015, also filed a motion for a subpoena directed to American Health and Life Insurance Company. [Docket Nos. 60, 61]. The Court denied the motion because the parties had already stipulated to determination of this proceeding on the basis of the record then before the Court and because it did not appear that the documents the Plaintiff wanted AHLIC to produce were material. Order on Motions for Issuance of Alias Summons and for Extension of Time for Plaintiff to File Brief (September 1, 2015) [Docket No. 65]. The Plaintiff also filed an Affidavit and Supplemental Affidavit [Docket Nos. 68 and 69] after the close of evidence. The Court discusses these issues further in later text.

This adversary proceeding is, therefore, ready for the Court to determine on the basis of the record and arguments before the Court, without a trial. This constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. Proc. 52(a), *applicable under* Fed. R. Bankr. P. 7052.

The District Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b). It has been referred to the Bankruptcy Court under 28 U.S.C. § 157(a) and LR 83.7, NDGa. Because a proceeding to determine the dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I), the Bankruptcy Court has authority to hear and determine this proceeding under 28 U.S.C. § 157(b)(1).

## II. STATEMENT OF THE EVIDENCE

On October 16, 2004, Betty Joyce Cloninger, the mother of the Plaintiff, the Debtor, and their two sisters, died. At the time of her death, Ms. Cloninger owned two assets that are material here.

First, Ms. Cloninger owned a home located at 6210 S.W. 16th Street, North Lauderdale, Florida, 33068. The home was subject to a mortgage in favor of CitiFinancial Equity Services, Inc. ("CitiFinancial") in the amount of approximately $108,000.

Second, Ms. Cloninger had a life insurance policy with American Health and Life Insurance Company ("AHLIC") with a death benefit of $50,000.00. Ms. Cloninger applied for the AHLIC insurance policy on

December 12, 2003. (Exhibit I–1 [Docket No. 51 at 20]). The first beneficiary on the life insurance policy was CitiFinancial to the extent of the mortgage debt, and the second beneficiary was the Debtor. (*Id.*).

### A. Initiation of Probate Proceedings

Jeffrey Kahn is a lawyer in Coral Springs, Florida, who provided legal services in connection with the probate of Ms. Cloninger's estate and in connection with the claim for the death benefit on the AHLIC insurance policy. His representation with regard to the probate of Ms. Cloninger's estate began on October 21, 2004.[3] (Exhibit Y–1[4] [Docket No. 51 at 50]).

On November 29, 2004, the Debtor signed an "Oath of Personal Representative, Designation of Resident Agent, and Acceptance" with regard to the probate of Ms. Cloninger's estate. (Exhibit V–1 [Docket No. 51 at 45]). The Oath was signed before Jeffrey Kahn, a notary public, who also accepted designation as the Resident Agent.

Letters of Administration were granted to the Debtor on January 27, 2005, by the Probate Division of the Circuit Court for Broward County. (Exhibit V–2 [Docket No. 51 at 46]).

### B. The Claim for AHLIC Life Insurance Policy Proceeds and the Sale of the Home

On October 25 and 28, 2004, shortly after Mr. Kahn began his representation, his office had telephone conversations with

---

3. Facts with regard to the involvement of Mr. Kahn and his office in many instances come from invoices in the file. The time entries are not in chronological order.

4. Exhibits are identified by the letter that the Court assigned to them. Copies of the exhib-

its thus identified are attached to the Court's Order at Docket No. 51. The number following the dash after the letter is the appropriate page of the exhibit and the bracketed information references the page at Docket No. 51 at which the cited page appears.

a representative of CitiFinancial with regard to Ms. Cloninger's death and the mortgage (Exhibit Y–3, Y–1 [Docket No. 51 at 52, 50] ). On November 3 and 4, the attorney's office communicated with CitiFinancial with regard to a death claim and sent a letter to CitiFinancial that enclosed a copy of the Death Certificate and referred to a request for a death claim form. (Exhibit Y–1, D [Docket No. 51 at 50, 14] ).

On November 29, the same day that the Debtor signed the probate papers, Mr. Kahn's office communicated with the Debtor's sister, Wanda Jean Hackett, regarding the CitiFinancial mortgage and foreclosure, and spoke with a CitiFinancial representative. (Exhibit Y-1 [Docket No. 51 at 50] ).

AHLIC received a claim on Ms. Cloninger's policy on December 6, 2004. (Exhibit H [Docket No. 51 at 18] ). On December 7, 2014, an AHLIC representative wrote to CitiFinancial with regard to a claim on the policy. (Exhibit E [Docket No. 51 at 15] ). AHLIC's correspondence to CitiFinancial states, "A claim has been received on [Betty Cloninger], but is incomplete." It requested a copy of the death certificate and a statement completed by the next of kin that included the full names and complete mailing address of all medical providers for the last five years. (Id.). AHLIC sent another request for this information on December 30, 2004. (Exhibit F [Docket No. 51 at 16] ). AHLIC received Ms. Cloninger's death certificate stating the manner and cause of her death on January 11, 2005. (Exhibit K [Docket No. 51 at 25] ).

On December 15, 2004, Mr. Kahn's office spoke by telephone with Ms. Hackett about the CitiFinancial mortgage payment. (Exhibit Y–3 [Docket No. 51 at 52] ). On December 17, Ms. Hackett made a pay-

ment of $ 1,290 to CitiFinancial. (Exhibit U–3, U–4 [Docket No. 51 at 43–44] ). She made another payment of $ 900 on December 28. (Exhibit U–1, U–2 [Docket No. 51 at 41–42] ).

On December 21, 2004, Mr. Kahn's office spoke with a real estate agent with regard to the sale of the home. (Exhibit Y–1 [5] [Docket No. 51 at 50] ). The Debtor signed a contract for the sale of the home to a third party on December 27, 2004. (Exhibit A–1, A–7 [Docket No. 51 at 3, 9] ).

On December 28, 2005, the Debtor spoke with Mr. Kahn's office about the insurance claim. (Exhibit Y–3) [Docket No. 51 at 52] ). The next day, Mr. Kahn's office prepared a letter to AHLIC requesting a claim form. (Exhibit Y–2 [Docket No. 51 at 51] ).

It appears that the Debtor signed the letter on January 5, 2005. (Exhibit G [Docket No. 51 at 17] ). This letter, addressed to Ms. Sheila Workman of AHLIC, confirmed that Mr. Kahn represented Ms. Cloninger's estate and authorized AHLIC to speak with Mr. Kahn. (Exhibit G [Docket No. 51 at 17] ).

Ms. Workman responded on behalf of AHLIC by letter dated January 12, 2005. (Exhibit H [Docket No. 51 at 18] ). Her letter notes that a claim was received on December 6, 2004, but that additional documentation was needed. Ms. Workman refers to the December 7 and 30 letters discussed above and states that copies had been provided to the Debtor. Her letter notes that AHLIC still required a copy of the credit application from CitiFinancial and the claimant's section of the claim form completed by Ms. Cloninger's next of kin so that it could begin its investigation of the claim. The letter enclosed the re-

---

**5.** The time entry refers to a telephone call with "B. Parsons." B. Parsons was the real estate agent. See Exhibit A–8 [Docket No. 51 at 8].

quired form for the Debtor to complete and return. (*Id.*).

Meanwhile, at various times between January 4 and 12, 2005, Mr. Kahn's office had various communications with regard to the sale of the home and the preparation of papers for authorization from the Probate Court to sell it. (Exhibit Y–2, Y–3 [Docket No. 51 at 51, 52] ). On January 19, Mr. Kahn prepared a petition to sell the home with the Probate Court. (Exhibit Y–2 [Docket No. 51 at 51] ).

On January 21, Mr. Kahn forwarded to Ms. Workman the claim form and insurance application. (Exhibit I [Docket No. 51 at 19] ). The claim form noted CitiFinancial as the primary beneficiary and the Debtor as the second beneficiary.

On January 29, 2005, the Probate Court entered an Order authorizing the sale of Ms. Cloninger's home, finding that all interested persons were served with proper notice of the sale hearing or waived notice. (Exhibit B [Docket No. 51 at 11] ).

The Debtor, as the personal representative of Ms. Cloninger's estate, concluded the sale of the home to a third party for $147,000.00 on January 31, 2005. At the closing of the transaction, the mortgage debt owed to CitiFinancial was satisfied with a payment of $108,220.95. After payment of costs and other expenses from the sale, the estate received net proceeds of $23,265.58. (Exhibit C [Docket No. 51 at 12] ). The net proceeds were paid to Mr. Kahn's trust account for disbursement in the probate proceeding.

AHLIC received the next of kin authorization it required on January 31 and began its investigation of the insurance claim by requesting medical information on February 4. (Exhibit K [Docket No. 51 at 25] ). AHLIC received the medical information it required on March 9 and processed payment to CitiFinancial, as the primary beneficiary, on March 16. (*Id.*). Mr. Kahn's office spoke with a CitiFinancial representative and the Debtor that same day with regard to the disbursement to CitiFinancial. (Exhibit Y–4 [Docket No. 51 at 53] ).

AHLIC learned on April 4 that the CitiFinancial loan had already been paid on February 6. Accordingly, AHLIC stopped payment on the original check and, on April 7, re-issued a check payable to the Debtor on April 7, 2005. (Exhibit K [Docket No. 51 at 25] ).[6]

The Debtor believed that a prompt sale of the home was necessary in order to avoid foreclosure by CitiFinancial. As he states, "[T]he estate did not have any ways or means to continue to pay on her already delinquent mortgage....[T]he property was potentially going into Foreclosure, had it not been sold promptly. In the event that would have occurred, it would have wiped out everything and the Estate would

---

6. Information with regard to AHLIC's processing of the claim is set forth in a letter from AHLIC to Ms. Tiffany Farmer, dated June 27, 2013. (Exhibit K [Docket No. 51 at 25] ). The letter states in pertinent part:

When the claim was received in our [AHLIC's] office, we [AHLIC] did not receive a death certificate with the manner and cause of death. Based on this, we requested this information from an attorney and the next of kin on 12/07/04 and again on 12/30/04. On 1/11/05, we received a death certificate confirming the manner and cause of Betty Cloninger's death. As the insured died within the 2 year contestability period of this certificate and died of a condition listed on the good health statement [sic]. On 01/12/05, we requested a next of kin authorization which included all treating physicians for Ms. Clininger [sic] prior to her signing the good health statement. We received this document on 1/31/05 and sent our first request for medical information on 2/04/05. We received additional information on 04/04/05 regarding the fact that the loan had already been paid off on 02/06/05. A stop pay was placed on the original check and the check was re-issued on 04/07/05.

have had nothing to pass to the heirs as an inheritance. By selling the [home] within a few months [after] her death, it allowed a small amount of inheritance, after all creditors and reimbursement claims were taken in consideration, to be given to all the children of her estate...." (Debtor's "Motion to Move for Summary Judgment", [Docket No. 19 at 3]). Ms. Hackett, the Debtor states, was making interest-only payments to CitiFinancial to avoid the property from going into foreclosure status. (Debtor's Statement of Undisputed Facts (attached to "Objection to an Order") ¶ 21 [Docket No. 32 at 6]).

The Debtor states that Mr. Kahn was in constant communication with all of the siblings, that there was full disclosure of the life insurance policy, and that all of the siblings agreed that the home had to be put up for sale due to the inability of the estate to make the mortgage payments. (Debtor's Statement of Undisputed Facts (attached to "Objection to an Order") 18, 21, 22 [Docket No. 32 at 6, 7]).

Prior to the Debtor's receipt of the insurance proceeds in April, the Plaintiff on February 16 wrote a letter to Mr. Kahn in which he asserted his position that the payment of CitiFinancial before the claim had been processed did not entitle the Debtor to the money. The letter requested that Mr. Kahn take appropriate action to make sure that the proceeds were directed to Ms. Cloninger's estate. (Attachment AA-13 to Plaintiff's Response to February 13 Order [Docket No. 57[7] at 18]).

### C. Conclusion of Probate Proceedings and Disbursement of Proceeds

As of April 7, 2005, the Debtor had received the AHLIC insurance proceeds

and Ms. Cloninger's home had been sold, with $ 23,265.58 in net proceeds deposited in Mr. Kahn's trust account.

On June 1, 2005, the Plaintiff filed pleadings in the Probate Court, including a "Motion/Petition to Appoint Conflict Free Counsel" (Attachment AA-1 to A-4 to Plaintiff's Response to February 13 Order [Docket No. 57 at 6-9]) and a document titled "Petitioner William Edward Cloninger Announces That There Has Been 'Fraud' Committed Upon the Court and Motions for an Emergency Tele-Phonic [sic] Communication Hearing or Order to Transport to Hearing" (Attachment AA-5 to AA-15 to Plaintiff's Response to February 13 Order [Docket No. 57 at 10-20]). In the latter document, the Plaintiff asserts that Mr. Kahn knew or should have known that he was circumventing the basis of the life insurance policy and its first beneficiary when he convinced the Debtor that, if he sold the house, he would become the sole beneficiary of the life insurance policy because the mortgage would be paid off upon its sale.

On July 1, 2005, the Plaintiff sent several papers to the Probate Court and the Chief Judge of the Broward County Circuit Court where the probate matter was pending. He reasserted the allegations just discussed in a "Motion to Express for Specific Demand for Performance" dated July 1, 2005. (Attachment AA-19 to AA-25 [Docket No. 57 at 24-30]). In a "Declaration" dated July 1, 2005, sent to the Debtor, Mr. Kahn, and the Chief Judge of the Circuit Court, the Plaintiff demanded payment to him of one-fourth of the insurance proceeds and asserted that the Debtor's retention of the proceeds was civil theft in violation of Florida law. (Attach-

7. Docket No. 57 is the Plaintiff's response to the February 13 Order, to which he attached additional documents to be made part of the record. The Court admitted the documents as evidence to be considered in this matter in its April 10 Order [Docket No. 58].

ment AA–23 to AA–25 [Docket No. 57 at 28–30] ). In a letter to the Chief Judge, he enclosed copies of the July 1 papers and requested a hearing. (Attachment AA–26 to AA–27 to Plaintiffs Response to February 13 Order [Docket No. 57 at 31–32] ).

The Plaintiff made similar allegations in a "Motion Contesting the Appointment of the Personal Representative" dated August 20, 2005. (Attachment AA–16 to AA–18 to Plaintiff's Response to February 13 Order [Docket No. 57 at 21–23] ).

The record does not reflect the disposition of these matters in the Probate Court or that the Chief Judge took any action on them.

On March 2, 2006, the Probate Court entered an order determining that Ms. Cloninger's home was homestead property and that, upon her death, title to the property descended to her four children in equal shares. (Exhibit W [Docket No. 51 at 47] ).

On April 6, 2006, Mr. Kahn filed a petition in the Probate Court that requested authority to disburse the proceeds from the sale of Ms. Cloninger's home. (Exhibit L [Docket No. 51 at 26] ). The petition stated that the amount in Mr. Kahn's escrow account on account of the sale (including interest) was $ 24,739.18.

The petition requested authority to disburse the funds as homestead property of Ms. Cloninger in equal shares of $ 6,184.79 to her four children.[8] All of the funds were payable to the children, as proceeds from the sale of real property that descended to them, to the exclusion of creditors of the estate, who had filed claims totaling $ 12,393.35.

On April 10, 2006, the Plaintiff wrote Mr. Kahn in response to the disbursement petition in which he advised him that he had no objection to the disbursement. (Exhibit M [Docket No. 51 at 29]. The Plaintiff also asserted that he was "completely satisfied with my inheritance from my late mother's estate in the amount of $ 6,184.79, and the legal representation provided by counsel, Jeffrey B. Kahn, whom [sic] handled the legal affairs." [Docket No. 51 at 30).

The children did not receive $ 6,184.79 each, however. On May 23, 2006, Mr. Kahn sent a letter to all of the children with regard to a proposed settlement statement. (Exhibit S [Docket No. 51 at 38] ). The attached informal accounting provided for deduction of Mr. Kahn's legal fees and reimbursement to some of the children for amounts they had paid for funeral expenses, legal fees, and mortgage payments. After these deductions, the proceeds for distribution were $ 13,252.39, and each child received one-fourth of that, or $ 3,313.10, plus applicable reimbursements.[9]

The Plaintiff on May 30, 2006, agreed to the informal accounting. (Exhibits P and S–2 [Docket No. 51 at 32, 39] ), and he received his $ 3,313.10. (Exhibits R and T [Docket No. 51 at 37, 40] ).

On October 17, 2006, the Plaintiff filed an objection to the petition filed in the Probate Court for discharge and requested the scheduling of a telephonic hearing so that he could present argument to support his objections and allegations of fraud and theft committed by the Debtor as the personal representative. (Attachment AA–31 to AA–33 to Plaintiff's Response to February 13 Order [Docket No. 57 at 36–38] ).

---

8. Two children received one penny more to account for all of the funds.

9. The Plaintiff and sister Cheryl Lynn Kelleher each received $ 3,313.10. The Debtor received $ 4,456.10, and Wanda Jean Hackett received $ 9,733.29.

The record does not reflect any action on this objection.

On November 26, 2007, the Probate Court entered an order closing the estate. (Exhibit X [Docket No. 51 at 49] ).

### D. The Plaintiff's Affidavit and Supplemental Affidavit

After the parties agreed to determination of this adversary proceeding on the basis of the record then before the Court (as set forth in the April 10 Order), the Plaintiff filed an Affidavit (the "Affidavit"), a Supplemental/Addendum Affidavit (the "Supplemental Affidavit"), and a motion to supplement the record with them. [Docket Nos. 68–70].

In the Affidavit, the Plaintiff states, "In 2005, while I was back in the Broward County Jail ... [the Debtor] came to visit me and specifically promised me and I believed him when he said once the life insurance check is issued it's going directly to 'mom's estate's trust fund account because the house was not paid for when she died,' and once everything is finalized everyone will get their rightful share."

The Supplemental Affidavit restates that statement and adds, "Had I [known] at the time [the Debtor] asked me to sign authorizing the sale of our late mother's house that, he was not going to direct our late mother's life insurance proceeds to the estate's trust fund account, I would [have] never signed authorizing him to [sell] the house. Instead, I would have let ... the mortgage company of our late mother's house go ahead and move to foreclose on the house, as Michael said they were about to do. I then would have let the probate court settle the matter as to what was legal and lawful for the estate concerning as to how the life insurance proceeds would be directed."

The Court considers the admissibility of the Plaintiff's Affidavit and the Supplemental Affidavit and their weight and rules on the Plaintiff's motion in the Discussion below.

## III. DISCUSSION

A Chapter 7 discharge under 11 U.S.C. § 727(a) discharges the debtor from all debts arising prior to the date of the Chapter 7 petition except those that are excepted from discharge under 11 U.S.C. § 523. Courts narrowly construe exceptions to discharge against the creditor and in favor of the debtor. *E.g., Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir.1994); *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir. 1993). A creditor has the burden of proving the availability of an exception to discharge by a preponderance of the evidence. *E.g., Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### A. Nondischargeability Under Section 523(a)(2)(A)

■ Section 523(a)(2)(A) of the Bankruptcy Code provides that debts for "money, property, services, or an extension, renewal, or refinancing of credit" are excepted from discharge to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The purpose of this provision is "to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors." *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir.2000) (*quoting* 4 Lawrence P. King, *Collier on Bankruptcy* ¶ 523.08[1][a] (15th ed. rev.2000)).

■ The Plaintiff's complaint alleges fraud, but it does not allege that the Debt-

or made any representation. In conclusory language, the complaint alleges that the Debtor committed fraud by embezzling $ 12,750; that he willfully, knowingly, and maliciously failed to notify the Probate Court of the insurance policies and failed to ensure that the death benefit went to the probate estate's account; that the Debtor willfully, knowingly, and maliciously waited until after the sale of the house before filing a claim for the death benefit; that his actions constituted fraud and defalcation while acting in his official fiduciary capacity; and that the Debtor's actions constituted civil theft under Florida law. (Complaint ¶¶ 2, 4–8).

In his Affidavit and Supplemental Affidavit filed in September and November 2015, however, the Plaintiff states that the Debtor visited him in jail and told him that he would direct the death benefit to the estate's account after the sale of the residence in order to induce the Plaintiff to sign an authorization for the sale of the residence.

The complaint, the record in this case (which includes a number of papers that the Plaintiff filed in the Probate Court), and the stipulated facts to which the parties agreed contain no reference at all to a meeting between the Plaintiff and the Debtor or to the statement that the Plaintiff asserts the Debtor made. The Plaintiff had ample opportunity to make this assertion in his complaint or in response to the Court's recitation of facts and the Court's direction to state any additional facts that the Plaintiff wanted the Court to consider. The Plaintiff similarly had ample opportunity to raise these assertions as a factual issue to be tried before he agreed to determination of the issues on the basis of the record in April 2015. Moreover, although the Plaintiff repeatedly attempted to obtain information from AHLIC that the Court determined was not material to

this proceeding, the Plaintiff made no request for discovery from the Debtor with regard to their meeting or any statements the Debtor made.

In these circumstances, the Court declines to exercise its discretion to consider evidence submitted five months after the close of evidence and after the agreement of the parties for a trial on the basis of the record and stipulated facts and documents. This proceeding, filed in June 2012, had been pending for almost three years when the parties agreed to trial of the issues on the basis of stipulated facts, documents, and the record in April 2015. It is not appropriate to permit the Plaintiff to reopen the evidence to include additional evidence from him that he has known during the entire period. Accordingly, the Court denies the motion to supplement the record.

Alternatively, even if the Court were to consider the Affidavit and Supplemental Affidavit as part of the evidence, the Court could not find as a matter of fact that the meeting occurred and that the statements were made as they state. In view of the absence of any previous indication in the record of the existence of the meeting and statements of the Debtor that the Affidavit and Supplemental Affidavit describe, and in view of the other evidence in the record, discussed below, indicating the absence of any fraudulent intent on the Debtor's part, the Court finds that the Plaintiff's statements in the Affidavit and Supplemental Affidavit with regard to these matters are not credible.

The Court also notes that the Plaintiff, in a letter to the estate's attorney, Mr. Kahn, dated February 16, 2005, states the following: "Please be advised, that I have been informed by [the Debtor] that you have advised him that the insurance money of our late mother's death benefits are his to do as he pleases. The advice you

have given him is wrong." (Exhibit AA–13 [Docket No. 57 at 18] ). It is a fair inference from the evidence that if, as the Plaintiff's Supplemental Affidavit asserts, the Debtor had earlier[10] told the Plaintiff that the death benefit would go to the estate account in order to induce him to agree to the sale, a letter complaining about the Debtor's retention of the death benefit would have made a reference to such a representation.

■ Although the Plaintiff has thus not established the existence of a representation by the Debtor, this does not end the inquiry. It is not essential to the § 523(a)(2)(A) exception that a creditor establish false pretenses or a misrepresentation. In *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir.2000), the Seventh Circuit held that "actual fraud" is not limited to misrepresentations or false pretenses, but may encompass "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Id.* at 893 (*quoting* 4 Lawrence P. King, *Collier on Bankruptcy* ¶ 523.08[1][e] · at 523–45 (15th ed. rev. 2000)). This Court has adopted this principle. *E.g., FDS Nat'l Bank v. Alam (In re Alam)*, 314 B.R. 834, 840–41 (Bankr. N.D.Ga.2004).

■ The *McClellan* court opined that, because common law fraud does not always take the form of a misrepresentation, a creditor need not allege misrepresentation and reliance thereon to state a cause of action for actual fraud under § 523(a)(2)(A). *Id.* Rather, the creditor must establish the following: (1) a fraud

occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud created the debt that is the subject of the discharge dispute. *McClellan*, 217 F.3d at 893.

■ The determination of whether a debtor has the requisite state of mind is a factual question for the court to resolve through review of all of the relevant circumstances of the particular case. Because direct proof of fraudulent intent is often unavailable, as is the case here, fraudulent intent may be inferred from the surrounding circumstances.

■ The preponderance of the evidence in this matter does not establish that the Debtor engaged in "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another" that establishes the existence of actual fraud under the *McClellan* standard. The evidence shows that the Debtor and the estate's attorney, Mr. Kahn, acted with appropriate diligence to make a claim on the insurance policy and to provide papers to process the claim and other information that the insurance company required. The Court cannot find from the evidence that the Debtor did anything to delay the processing of the claim or the payment of the death benefit.

At the same time, the evidence shows without dispute that the Debtor and his sister, Ms. Hackett, were concerned that CitiFinancial would proceed to foreclose on the residence if it did not receive payments on the mortgage that no one was in a position to make on a continuing basis. The evidence indicates that both Ms.

10. The Affidavit and Supplemental Affidavit do not specify the time in 2005 that the Plaintiff asserts the Debtor made the statement that the death benefit would go to the estate's account. To be material the statement would have to have been made prior to the sale of the house—that is, in January 2005—to serve

as a representation for purposes of fraud. This is because, after the sale of the house occurred and the mortgage had been satisfied, the Plaintiff could not have relied on the statement in view of the fact that all material events had already occurred.

Hackett and, more critically, the Debtor, thought that the only way to avoid foreclosure was the prompt sale of the residence and payment of the mortgage from the sales proceeds. Nothing in the evidence indicates that Mr. Kahn or anyone else advised them of any other alternatives or that they had any reason to believe that any other alternative existed.

Indeed, it is a fair inference from the evidence that the Debtor was acting under the advice of counsel with regard to these matters. The estate's attorney, Mr. Kahn, knew of all of the material facts concerning the insurance policy and the sale of the house and represented the Debtor, as the estate's personal representative, with regard to both matters. The preponderance of the evidence establishes that the Debtor acted on the advice of counsel, not with any intent to defraud.

■ As discussed in the next section, objective analysis of the situation indicates that other alternatives did in fact exist and that the failure to consider and pursue them raises questions about whether the Debtor breached his fiduciary duty as the personal representative. But the exception to discharge for fraud under § 523(a)(2)(A) requires a *subjective* intent to defraud another.

To find a subjective intent to defraud here, the Court would have to make a factual finding that the Debtor intentionally orchestrated the timing of the sale of the residence to obtain the benefits of the life insurance policy. The requisite subjective intent could be inferred from evidence that the Debtor knowingly expedited the sale or delayed the processing of the insurance claim so that the mortgage would be paid from the sale, thus entitling him to the death benefit under the terms of the policy.

The evidence shows the diligent prosecution of the insurance claim and the Debt-

or's belief that the prompt sale of the residence was the only alternative to foreclosure. The Court cannot find on the basis of this evidence that the Debtor engaged in a scheme with regard to the timing of the sale of the residence with the intent of diverting the death benefit to himself.

■ The Plaintiff's statements in his Affidavit and Supplemental Affidavit that the Debtor told him that he would deposit the death benefit in the estate's account but did not intend to do so support a claim for fraud because a promise to do something that the promisor does not intend to do at the time of the statement constitutes fraud. *Cf. FDS Nat'l Bank v. Alum (In re Alum)*, 314 B.R. 834, 840–41 (Bankr. N.D.Ga.2004). But as discussed earlier, the Court rejects this evidence as not timely and not credible.

Moreover, an intent on the part of the Debtor to appropriate the insurance proceeds for himself is inconsistent with the undisputed and credible evidence in the case that the Debtor and his attorney promptly filed and prosecuted the insurance claim. Nothing indicates that the Debtor knew that AHLIC would investigate the claim or that its payment would be delayed until after the house had been sold. Even if the Court accepts the statements in Plaintiff's Affidavit and Supplemental Affidavit as evidence of fraudulent intent, the other evidence discussed earlier negates such intent. The Court cannot conclude that the preponderance of the evidence establishes that the Debtor intended to defraud the Plaintiff.

In summary, the preponderance of the evidence fails to show that the Debtor acted fraudulently. The Court, therefore, concludes as a matter of law that the Plaintiff's debt is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

## B. Nondischargeability Under Section 523(a)(4)

The Plaintiff also asserts that the debt is a debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" that is excepted from discharge under 11 U.S.C. § 523(a)(4). The Court will discuss each ground in turn.

### 1. Fraud or defalcation while acting in a fiduciary capacity

To establish a claim for fiduciary fraud or defalcation under Section 523(a)(4), a creditor must show: (1) that the debtor held a fiduciary position *vis a vis* the creditor under a technical, express or statutory trust; (2) that the claim arose while the debtor was acting as a fiduciary; and (3) that the claim is for fraud or defalcation. *E.g. Caitlin Energy, Inc. v. Rachel (In re Rachel)*, 527 B.R. 529, 540 (Bankr.N.D.Ga.2015) (Hagenau, J.).

The first question is whether the Debtor was a fiduciary for purposes of § 523(a)(4). As the Eleventh Circuit has explained, the term "fiduciary" in § 523(a)(4) "is not to be construed expansively, but instead is intended to refer to 'technical' trusts." *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir.1993). Thus, a trust for purposes of § 523(a)(4) must be "an express trust created by statute or contract that imposes trust-like duties on the debtor and that pre-exists the alleged defalcation," as opposed to constructive or resulting trusts. *Parker v. Ferland (In re Ferland)*, 2010 WL 2600588, at *3 (Bankr. M.D.Ga. June 21, 2010) (*quoting Quaif v. Johnson*, 4 F.3d at 953–54); *see also Guerra v. Fernandez–Rocha (In re Fernandez–Rocha)*, 451 F.3d 813, 816 (11th. Cir.2006).

The requirement of a technical or express trust, however, "is not limited to formal contractual trust agreements, but can include relationships in which trust type obligations are imposed pursuant to statute, or potentially by common law." *McDowell v. Stein*, 415 B.R. 584, 594 (S.D.Fla.2009); *see also Quaif*, 4 F.3d at 953–54 (licensed insurance agent is a fiduciary under § 524(a)(4) as to insurance premiums received or owed because state statute imposed fiduciary obligations on agent).

Although the meaning of the word "fiduciary" in § 523 is a question of federal law, *Smith v. Khalif (In re Khalif)*, 308 B.R. 614, 621–22 (Bankr.N.D.Ga.2004), state law can be consulted in ascertaining whether such a duty has been imposed. *Quaif*, 4 F.3d at 954.

Fla. Stat. Ann. § 733.602(1) provides, "A personal representative is a fiduciary who must observe the standards of care applicable to trustees." Similarly, Fla. Stat. Ann. § 733.609(1) states, "A personal representative's fiduciary duty is the same as the fiduciary duty of a trustee of an express trust, and a personal representative is liable to interested persons for damage or loss resulting from the breach of this duty." Under these standards, the Court concludes that a personal representative of a decedent's estate in Florida is a fiduciary for purposes of § 523(a)(4). *Accord, Cabana v. Kurzon (In re Kurzon)*, 399 B.R. 274, 282 (Bankr.M.D.Fla.2008).

As the personal representative of Ms. Cloninger's estate, therefore, the Debtor had a fiduciary duty to act in the best interests of the estate and its beneficiaries, including the Plaintiff.

The second requirement for application of § 523(a)(4) is also met. The Plaintiff's claim arises from the Debtor's administration of the estate, as a fiduciary, by proceeding with the sale of the residence by the estate before the processing of the insurance claim that would have reduced

the mortgage debt and increased the amount the estate realized from the sale.

The remaining question is whether the Debtor committed fraud or defalcation in his fiduciary capacity.

█ Under Florida law, malfeasance by an estate's personal representative constitutes a breach of fiduciary duty regardless of the fiduciary's intent. *See In re Estate of Salomon,* 791 So.2d 1150, 1152 (Fla.Dist.Ct.App.2001); *In re Corbin's Estate,* 391 So.2d 731 (Fla. 3d DCA 1980); *see also Dacus v. Blackwell,* 90 So.2d 324, 328 (Fla.1956) ("[A] personal representative should not be allowed to profit by failing to do what the fiduciary relationship requires him to do"); *cf. Stilwell v. Estate of Crosby,* 519 So.2d 68, 70 (Fla.Dist.Ct. App.1988) (transaction where personal representative has a conflict of interest is voidable).

In *Salomon,* the personal representative, the decedent's widow, took stocks that were supposed to be part of the decedent's estate and treated them as if they were a joint asset that she and the decedent owned. *Salomon,* 791 So.2d at 1152. The widow and her two sons, the next beneficiaries of the stocks, thought it would be in the best interest of the estate to administer the stocks as a joint asset. *Id.* The Florida District Court of Appeal determined there was a "distinct conflict of interest between [the widow] and the residual interest" of the estate. *Id.* The Court further determined the widow breached her fiduciary duty to the estate despite her belief that she acted in the best interest of the estate. *Id.*

█ The claim of the Plaintiff here is that the Debtor used his position as the personal representative to effect a sale of the residence prior to payment of the death benefit. The timing resulted in the Debtor's receipt of a substantial personal benefit and a corresponding financial loss for the estate and its beneficiaries, including the Plaintiff.

█ A cardinal principle of fiduciary law is that a fiduciary cannot use his position to benefit himself. The issue here is whether, as the Debtor asserts, the prompt sale of the residence was necessary in order to avoid a foreclosure sale, which could have resulted in the estate realizing nothing.

The Court accepts the Debtor's assertion that the estate did not have the funds to make the monthly mortgage payments and that no one else was in a position to make the payments either. But it does not follow that the failure to make mortgage payments would have resulted in a foreclosure sale that would have produced nothing for the estate.

█ Foreclosure under Florida law is through a judicial process, which means a lender must file a lawsuit to foreclose on a mortgage. Fla. Stat. Ann. § 702.01. The estate would have had the opportunity to seek a brief stay of the foreclosure proceeding to permit the processing of the death benefit, particularly with a contract for sale in hand with a sales price substantially in excess of the mortgage debt. Alternatively, the estate might have sought an order in the foreclosure court or in the Probate Court permitting the sale with the sales proceeds escrowed for payment of the mortgage in full if CitiFinancial did not receive the death benefit. If the estate could not have obtained either remedy, it still would have had time to complete the sale under the contract and pay off the mortgage before the foreclosure court ordered a sale of the residence.

Moreover, it is possible that CitiFinancial would have agreed to a brief forbearance in the circumstances to allow for the processing of the insurance claim. Mr.

Kahn's time records indicate conversations with CitiFinancial representatives, but they do not reveal the nature or content of the discussions or whether Mr. Kahn requested a delay.

Nothing in the record indicates that the Probate Court knew that the effect of its order authorizing a prompt sale of the residence could be a loss to the estate of over $50,000. In view of the potential alternatives just discussed that could avoid that result, the Probate Court might not have approved the sale until the insurance claim had been resolved.

Nothing in the record indicates that the Debtor considered any of these alternatives. By failing to do so, he arguably breached his fiduciary duty to take actions in the best interests of the estate. The Court will assume, without deciding, that the Debtor breached his duty. If the Debtor breached his fiduciary duty, he has no defense based on a belief that the prompt sale of the residence was in the best interest of the estate because it was essential to prevent foreclosure and to prevent a realization of nothing for the estate. *See Salomon,* 791 So.2d at 1152.

Bankruptcy courts in Florida have ruled that a breach of fiduciary duty, even if innocent, constitutes defalcation within the meaning of § 523(a)(4) and that the liability is, therefore, excepted from discharge. *E.g., In re Kurzon,* 399 B.R. 274, 276 (Bankr.M.D.Fla.2008); *In re Valdes,* 98 B.R. 78 (Bankr.M.D.Fla.1989). These cases, however, were decided before the Supreme Court's decision in *Bullock v. BankChampaign, N.A.* —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013).

 In *Bullock v. BankChampaign, N.A.,* the Supreme Court held that "defalcation" for purposes of § 523(a)(4) requires a culpable state of mind that involves knowledge of or gross recklessness with respect to improper fiduciary behav-

ior. The Supreme Court ruled, *id.* at 1757 (emphasis added):

> Section 523(a)(4) of the Federal Bankruptcy Code provides that an individual cannot obtain a bankruptcy discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). We here consider the scope of the term "defalcation." We hold that it includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.

The *Bullock* Court explained further, *id.* at 1759–60 (emphasis added):

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. *Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.* ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See *id.,* § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disre-

gard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.*, § 2.02(2)(c), at 226 (emphasis added). Cf. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

 Thus, after *Bullock*, nondischargeability of a liability on account of a breach of fiduciary duty under § 523(a)(4) requires a factual finding that "the debtor acted with wrongful intent, or, at a minimum, with a conscious disregard of his or her fiduciary duties." *Jantz v. Karch (In re Karch)*, 499 B.R. 903, 906 (10th Cir. BAP 2013). A creditor must show that "the debtor disregarded a harm of which he was aware," meaning "the debtor must have been subjectively aware he had a fiduciary duty and his actions risked breaching such a duty or that he was willfully blind meaning he was subjectively aware of the probable existence of a fact but did not make any effort to determine if the fact exists." *Caitlin Energy, Inc. v. Rachel (In re Rachel)*, 527 B.R. 529, 542–43 (Bankr.N.D.Ga.2015).

The evidence in this case does not establish that the Debtor acted with culpable intent. Like the debtor in *Bullock*, the debtor is not a professional fiduciary, and his fiduciary position arose out of his family situation. The Debtor employed an attorney and told him about the insurance policy. The attorney followed up with regard to the processing of the claim, was in contact with CitiFinancial representatives, and sought and obtained an order from the Probate Court for the sale of the house. A fair inference from the evidence is that the Debtor acted under the advice of counsel with regard to the conduct at issue.[11]

The evidence does not show that the Debtor intentionally delayed the processing of the insurance claim or expedited the sale of the residence in order to get the mortgage paid from the sale instead of from the death benefit. Rather, the Debtor's liability for breach of fiduciary duty arises from his failure to consider the alternatives to foreclosure that the Court discussed above. But nothing in the record indicates that the Debtor was aware of such alternatives.

In these circumstances, the Court cannot find from a preponderance of the evidence that the Debtor knew that his conduct was improper or that he consciously disregarded, or was "willfully blind to," a substantial risk that he would breach a fiduciary duty. A lay person like the Debtor cannot be expected to understand the legal and equitable theories that give rise to the alternatives that he should have pursued.

 It is noteworthy in assessing the Debtor's culpability that he acted under advice of legal counsel. As the court observed in *Shears v. Vestal (In re Vestal)*, 521 B.R. 604, 611–12 (Bankr.W.D.Mich. 2014) (citations and internal quotation marks omitted):

> Regardless of the soundness of counsel's advice, and regardless of whether such justification would relieve … the duty … as a matter of state statute, a nonprofessional trustee who consults coun-

---

11. The Plaintiff himself asserted as much in the letter to Mr. Kahn, the estate's attorney, dated February 16, 2005, discussed in Section A of Part III. The letter states in pertinent part, "Please be advised, that I have been informed by [the Debtor] that you have advised him that the insurance money of our late mother's death benefits are his to do as he pleases. The advice you have given him is wrong." (Exhibit AA–13 [Docket No. 57 at 18]).

sel and follows counsel's advice cannot justly be regarded as disregarding a substantial and unjustifiable risk that his conduct [would] turn out to violate a fiduciary duty. Such a trustee may have a debt arising under state law (for example, if he is mistaken about his duty), but the debt may nevertheless be discharged if he is not sufficiently culpable under federal law.

*See also Jantz v. Karch (In re Karch)*, 501 B.R. 403, 409 (Bankr.D.Colo.2013) ("Under the *Bullock* lens, the Court finds ample evidence [the debtor] did not act with a conscious disregard of his obligations as a fiduciary for his father's probate estate. On the contrary, [the debtor] hired counsel to oversee the probate process, [and] consulted with counsel prior to making any distributions ...."), *on remand from* 499 B.R. 903, 906 (10th Cir. BAP 2013).

In summary, assuming the Debtor breached his fiduciary duty, the Court finds that he did not have the requisite culpable intent that § 523(a)(4) requires for the liability to be nondischargeable.

### 2. Embezzlement and Larceny

Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Ga. Dep't Human Servs. v. Ngwangu (In re Ngwangu)*, 529 B.R. 358, 365 (Bankr.N.D.Ga.2015) (*quoting Fernandez v. Havana Gardens, LLC*, 562 Fed. Appx. 854, 856 (11th Cir.2014). Larceny is " 'a felonious taking of property with the intent to convert it or to permanently deprive the owner of it.' " *Burke v. Riddle (In re Riddle )*, No. 10–42735–PWB, 2011 WL 2461896, at *4 (Bankr.N.D.Ga. Apr. 6, 2011) (Bonapfel, J.) (quoting *Bennett v. Wright (In re Wright)*, 282 B.R. 510, 516 (Bankr.M.D.Ga.2002)). Embezzlement

and larceny both require fraudulent intent. *E.g. id.*

No embezzlement occurred here. The Debtor lawfully received the death benefit from AHLIC as the second beneficiary because the mortgage debt had been satisfied. As discussed above, Plaintiff may have a claim against the Debtor based on the timing of the sale of the home that resulted in the payment of the mortgage, but that claim does not, as a matter of law, sound in embezzlement. He was contractually entitled to the money, and a person "cannot embezzle one's own property." *Reshetar Sys. Inc. v. Thompson (In re Thompson)*, 686 F.3d 940, 947 (8th Cir.2012).

No larceny occurred, either. Being entitled to the money, the Debtor could not have taken it wrongfully.

In any event, both embezzlement and larceny require fraudulent intent. As previous sections explain, the Court cannot find by a preponderance of the evidence that the Debtor acted fraudulently.

### C. Nondischargeability Under Section 523(a)(6)

Section 523(a)(6) excepts from discharge "any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity."

The Supreme Court has ruled that nondischargeability under § 523(a)(6) requires a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original). An injury is "willful" when the debtor "commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir.2012) (*quoting*

*Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir.1995). An injury is "malicious" when the debtor's actions are "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill–will." *Id. (quoting Walker*, 48 F.3d at 1164). An injury caused negligently or recklessly is insufficient under § 523(a)(6). *Kawaauhau*, 523 U.S. at 64, 118 S.Ct. 974.

■ It is important to recognize the conduct for which the Debtor is liable. He is not liable because he received the death benefit to which he was entitled as the secondary beneficiary upon the satisfaction of the mortgage before AHLIC paid it. Nor is he liable because he failed to pay the death benefit to the estate because, again, he was entitled to it.

The acts of receiving and retaining the death benefit were not wrongful and they were not the cause of the loss that the estate suffered. These acts were, rather, the consequences of the debtor's failure to fulfill his fiduciary duty to the estate with regard to the timing of the sale and payment of the mortgage. Thus, the Debtor is liable to the estate, and derivatively to the Plaintiff, based on his breach of fiduciary duty, not because he received and retained the death benefit.

Some ethicists might conclude that the Debtor had a moral or ethical obligation not to take advantage of the sale of the home and payment of the mortgage prior to the payment of the death benefit. They could conclude that the Debtor should have shared the death benefit with his siblings. Others might have a different view or insist on having more information about the family circumstances before making a moral or ethical judgment. Regardless, for purposes of determining the Debtor's liability to the Plaintiff, it is his actions as the personal representative of the estate that caused the loss to the estate, and derivatively to the Plaintiff, not his conduct after that loss occurred.

As Section B(1) of this Part discusses, the Debtor believed that a prompt sale of the residence was essential to avoid a foreclosure sale and to enable the estate to realize value from the home. The fact that he did not pursue other alternatives that could have given the estate the benefit of the insurance proceeds gives rise to his liability for breach of his fiduciary duty, but it does not make his conduct willful or malicious. From a subjective standpoint, he thought that he was acting in the best interests of the estate, and no one, including the estate's attorney, told him otherwise.

The Debtor's purpose was to benefit the estate, not to injure it. He was unaware of other alternatives and, having retained an attorney for the estate, could not reasonably be expected to think that a delay in selling the home was a realistic option.

The Plaintiff alleges that the debtor fraudulently failed to disclose the life insurance policy to the Probate Court before the Probate Court approved the sale. But this conduct, if true, is not properly attributable to the Debtor for purposes of determining whether he acted willfully and maliciously. The estate's lawyer had the necessary information about the insurance policy, the mortgage, and the lack of ability to make payments on the mortgage beyond those that Ms. Hackett made. The lawyer, not the Debtor, prepared the papers to present to the Probate Court, and nothing indicates that the Debtor told him not to disclose anything.

The preponderance of the evidence does not establish that, in doing what he thought was in the best interest of his mother's estate and its beneficiaries, including the Plaintiff, the Debtor intended to cause injury to the estate or to the

Plaintiff or that he acted without "just cause." Because the Plaintiff has not proved that the Debtor's liability is for a willful and malicious injury, therefore, the Court concludes as a matter of law that the Debt is not excepted from discharge under 11 U.S.C.A. § 523(a)(6).

## IV. CONCLUSION

Based on the findings of fact and conclusions of law set forth above, the Court concludes as a matter of law that the Plaintiff has not proved by a preponderance of the evidence that the debt of the Debtor to him is excepted from discharge under any of paragraphs (2), (4), or (6) of 11 U.S.C.A. § 523(a). The Court denies the Plaintiff's motion to supplement the record. [Docket No. 70].

The Court will enter a separate judgment in favor of the Debtor.

**IT IS ORDERED**